STATE of Missouri, Respondent,

v.

James Chalmers CAMPBELL, Appellant.

No. 12703.

Missouri Court of Appeals,
Southern District,
Division One.

July 12, 1983.

Robert P. Warden, Joplin, for appellant.

John Ashcroft, Atty. Gen., Melinda Corbin, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found appellant ("Campbell") guilty of the class C felony of stealing at least $150 in money, by deceit, § 570.030,

RSMo 1978, and assessed punishment at 90 days imprisonment in the county jail, § 558.011.2, RSMo 1978, as amended by Laws 1979, p. 633. The jury also recommended that the trial court assess a fine "in lieu of any imprisonment." The trial court imposed the jail sentence assessed by the jury, but suspended execution and placed Campbell on probation, § 559.012, RSMo 1978, subject to sundry conditions including restitution, § 559.021.2(1), RSMo 1978, as amended by Laws 1981, p. 637. No fine was imposed.

The theft is alleged to have occurred during the period from November 12, 1980, through February 7, 1981, from Rural Missouri Incorporated ("RMI"), an organization which, during that time, administered "manpower training programs" under the Comprehensive Employment and Training Act of 1973 ("CETA"), Pub.L. 93–203, 87 Stat. 839, as amended. The program pertinent here was one in which employers were induced to hire persons previously unemployed or underemployed, the inducement being reimbursement to the employer for up to fifty percent of those persons' wages for a fixed period. The funds for reimbursement were supplied by the United States government to RMI, which administered the program in Campbell's locale through an agency called Ozark Gateway Council ("OGC").

The information alleged Campbell represented to RMI that (a) Joseph DeWalt ("DeWalt") was an employee of ABC Pest Control ("ABC") during the period in question, and (b) ABC was entitled to reimbursement of $854, knowing the representations were false.

Campbell's sole point on appeal is that the evidence is not "unequivically (sic) inconsistent" with his innocence, in that the evidence does not support a finding that he knew the hours represented as having been worked by DeWalt were not in fact so worked. Campbell asserts the trial court erred in denying his motion for judgment of acquittal at the close of the State's case, and in denying a similar motion at the close of all the evidence.

■ Campbell did not stand on his motion for judgment of acquittal at the close of the State's case. After the motion was denied, he introduced evidence in his own behalf, thereby waiving any error with respect to the denial of the motion. *State v. Green,* 476 S.W.2d 567, 569[2] (Mo.1972). Accordingly, the submissibility of the case will be determined upon the basis of all the evidence, including those portions of Campbell's evidence that favor the State. *State v. Wood,* 553 S.W.2d 333, 334[3] (Mo.App. 1977). We view the evidence in the light most favorable to the State, accept all substantial evidence and all legitimate inferences fairly deducible therefrom which tend to support the verdict, reject contrary evidence, and disregard all evidence unfavorable to the State. *State v. Leach,* 633 S.W.2d 754, 755[1] (Mo.App.1982).

During the period in question, ABC, a corporation, maintained its office in Joplin, Missouri. Campbell was ABC's president and "major stockholder." He "ran the business."

ABC used "time sheets" to keep track of the hours its employees worked. Each sheet covered one employee for one week. At the beginning of each week, each employee put his name on a blank sheet, then filled in his hours each day. The sheets were kept on a "board" or in a box at ABC's office.

In an "employer contract" dated November 12, 1980, signed by Campbell, ABC, as employer, agreed with RMI and OGC to furnish employment and training for DeWalt beginning that date and continuing for 36 consecutive weeks, or until the training was successfully completed, whichever first occurred. The contract provided, *inter alia,* for ABC to submit to OGC, "by the 15th of each month," invoices for reimbursement for half of DeWalt's monthly wages, with RMI's liability not to exceed $100 per week.

Under date of December 3, 1980, ABC submitted to OGC a written "Request for On-Site Training Cost Reimbursement" for DeWalt's November wages. The Request,

signed by Campbell, showed DeWalt worked eight hours on each of these days: 12, 13, 14, 17, 18, 19, 20, 21, 24 and 25. Total wages were $400; ABC claimed $200 reimbursement. On December 22, 1980, RMI issued a check to ABC for the amount claimed, together with reimbursement for another CETA employee.

A similar procedure was followed regarding DeWalt's December wages. A Request, signed by Campbell and dated January 12, 1981, showed DeWalt worked eight hours on each of these December days: 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 22 and 23. Total wages were $544; ABC claimed $272 reimbursement. RMI paid ABC the amount claimed, by check dated January 22, 1981.

ABC, over Campbell's signature, submitted a Request dated February 3, 1981, for DeWalt's January wages. The Request showed DeWalt worked eight hours on each of these days: 1, 2, 5, 6, 7, 8, 9, 12, 13, 14, 15, 16, 19, 20, 21, 22, 23, 26, 27, 28, 29 and 30. Total wages were $704; ABC claimed $352. RMI reimbursed ABC that amount by check dated February 23, 1981.

Under date of March 4, 1981, ABC, over Campbell's signature, submitted a Request for DeWalt's February wages, showing DeWalt worked eight hours on each of these days: 2, 3, 4, 5 and 6. Wages of $160 were shown, with ABC claiming $80 reimbursement. RMI paid the claim by check dated March 19, 1981.

The Requests were supposed to be signed not only by the employer, but also by the trainee. The Requests for November and December showed DeWalt "unavailable." The Request for January bears a signature "Joseph E. DeWalt." At trial, DeWalt was not asked whether the signature was his. The Request for February showed DeWalt was "no longer employed here."

Records of the Greene County, Missouri, office of the Division of Family Services show DeWalt was at the office in Springfield applying for food stamps sometime between 8:00 a.m. and 5:00 p.m. December 11, 1980, one of the days for which ABC claimed wage reimbursement.

Records of the Springfield Police Department show DeWalt was arrested at 12:17 a.m. January 7, 1981, for inhaling solvents, and released at 10:20 a.m. the same day, another one for which ABC claimed reimbursement.

Records of the Hyland Plasma Center in Springfield show DeWalt arrived there to give blood at 2:00 p.m. January 19, 1981, and completed the procedure by 5:12 p.m. that day, another for which ABC claimed reimbursement.

By similar records, DeWalt was shown to have (a) applied for food stamps in Springfield January 27, 1981, between 8:00 a.m. and 5:00 p.m., (b) arrived at the Hyland Plasma Center in Springfield January 29, 1981, at 11:15 a.m. to give blood, completing the procedure at 1:13 p.m., (c) arrived at the Hyland Plasma Center at 11:15 a.m. February 2, 1981, giving blood at 1:18 p.m., (d) been "detained for drunk" in Springfield between 5:45 p.m. and 9:10 p.m. February 3, 1981, and (e) arrived at the Hyland Plasma Center at 11:15 a.m. February 5, 1981, departing at 12:50 p.m. that day. Each of these days is included among those for which ABC claimed wage reimbursement.

A "TERMINATION DATA/FOLLOW–UP" form maintained by RMI shows DeWalt was terminated by ABC on February 6, 1981, for "some health reason."

RMI's director in Jefferson City sent a certified public accountant from RMI's office to Joplin in June, 1981, to audit ABC's accounts. The Division of Manpower Planning had earlier sent someone to Joplin for the same purpose.

Joyce McGinthia worked for ABC in January and February, 1981, customarily arriving at the office around 7:00 a.m. and departing about 5:30 p.m. or thereafter. She testified Campbell was at the office almost every day, some days for an hour or two and other days for the entire day. Joyce never saw DeWalt the entire time she worked for ABC.

Joyce's husband, David, worked for a chimney sweeping company operated by

Campbell for six months, beginning in September, 1980. That company's office was in a room at the ABC office. David testified DeWalt was not employed by ABC. David saw DeWalt at ABC's office "once or twice," sitting on the sofa watching television.

Billy Dean Reynolds began working for ABC in January, 1981, constructing a building "out in back" of ABC's office. He did not see DeWalt working at ABC in January or February of 1981. Reynolds testified that sometime around October, 1981, Campbell told Reynolds he did not want Reynolds "to tell the truth." According to Reynolds, Campbell said he "didn't want to go to jail or prison," and that Reynolds was the only one who could send him to jail. Reynolds recalled that a few days after this conversation, Campbell came to Reynolds' house and tried to get Reynolds to go to the office of Campbell's lawyer and "deny everything" Reynolds had said in an earlier statement at the prosecuting attorney's office. The "main gist" of Campbell's conversations with Reynolds was about Reynolds' employment at ABC. Campbell did mention DeWalt, but the "major conversation" was not about him.

At trial, Campbell produced one paycheck for DeWalt. It was for $100, and dated November 28, 1980.

Mary Christine Davis, a "stockholder" in ABC, recalled that an "investigation" of ABC was conducted in the spring of 1981. Mary told Campbell that "if he thought it would help," she would make a "rough sketch" of the "cash draws" DeWalt would have had to receive—going back to "before Christmas"—in order that DeWalt would have had no paychecks due on paydays. To do this, Mary had to know how much DeWalt should have drawn each payday. She helped Campbell and an "office employee" make the calculations, but "didn't put anything down officially." Campbell ceased

working for ABC in August, 1981. A few weeks later, Mary discovered 22 time sheets in the back of a drawer in Campbell's desk. Each sheet bore DeWalt's signature, but was otherwise blank. Mary reported this to the prosecuting attorney's investigator.

DeWalt testified he was employed full-time at ABC in November, 1980. When asked whether he worked for ABC in December, 1980, he replied, "I take the Fifth." He also declined to say whether he worked for ABC in January and February, 1981. Asked whether he received money from ABC for December, 1980, and January and February, 1981, DeWalt answered, "I wish to take the Fifth." He refused to say whether he was residing in Jasper County during those months. DeWalt was shown 14 time sheets bearing his signature. The sheets covered the period from November 12, 1980, to February 6, 1981. Entries on the sheets showed DeWalt worked the exact days and hours for which ABC claimed and received reimbursement from RMI. DeWalt was asked whether he wrote the dates and hours on the sheets. He responded, "Take the Fifth." DeWalt was shown 11 receipts captioned "Received of Petty Cash." Each bore a signature purporting to be his. DeWalt testified the signatures on ten of the receipts were genuine. Those ten showed he received cash from ABC totaling $1,473 for work during the period from November 16, 1980, to February 6, 1981.[1] Asked whether he signed the receipts on the respective dates they showed, DeWalt replied, "Plead the Fifth."

DeWalt went to Wichita in February, 1981. He testified he went back to work for ABC the "first part" of April, 1981, and worked there until May 3, 1981. According to DeWalt, he was a full-time employee during that period, working 40 hours per week.

---

1. Nine of the ten receipts DeWalt admitted signing showed the dollar amount received. The aggregate of those nine is $1,313. The other receipt (Defendant's Exhibit 3) showed DeWalt was paid for 40 hours during the period from December 8, 1980, to December 12, 1980, but did not show the dollar amount. At his pay rate ($4 per hour) the amount would have been $160, and this sum is included in the $1,473 total. The receipt DeWalt said he did not sign (Defendant's Exhibit 8) was for another $160.

Campbell testified he terminated DeWalt February 6, 1981, because of poor attitude, tardiness, erratic behavior, absenteeism, and other undesirable traits. Campbell did not attribute DeWalt's dismissal to health reasons. Campbell recalled talking with DeWalt's "CETA counselor," Martha Merriman, before terminating DeWalt. According to Campbell, Ms. Merriman encouraged him to keep DeWalt "just as long as possible." Campbell denied hiring DeWalt again in April, 1981, explaining that DeWalt just "worked around the office doing odd jobs."

Campbell admitted a "State of Missouri investigator" asked Campbell to turn over the cash receipts bearing DeWalt's name. Campbell told the investigator the receipts "weren't available," that they "were scattered in with everything else." Campbell turned the receipts over to the investigator "about a week" after the demand. Campbell related that none of the cash receipts issued by ABC were numbered.

Martha Merriman, testifying for the State in rebuttal, recalled talking with Campbell in January and February of 1981, about his CETA employees. She remembered discussing the reasons why DeWalt "quit his job or left and then wanting to come back."

Campbell's argument, as we understand it, is based on the theory that (a) DeWalt filled out a time sheet at ABC each week during the period in question, showing the days and hours he claimed he worked each week, (b) ABC, during that period, paid DeWalt wages in the form of "cash draws," based on the data DeWalt put on the sheets, (c) ABC, through Campbell, sought reimbursement from RMI for half the wages ABC paid DeWalt during that period, (d) Campbell was unaware of any instance when DeWalt did not work the hours shown

on the sheets, and (e) Campbell submitted the requests for reimbursement to OGC in good faith.[2]

Campbell says the evidence is insufficient to prove he knew DeWalt did not work the hours DeWalt showed on the time sheets. Campbell argues that on many days he (Campbell) was in the office only an hour or two, that he was not there when the employees arrived each morning to go out on their jobs, that he had other business interests to attend, and that no one ever told him DeWalt was not working the hours DeWalt turned in on the sheets.

Campbell's testimony, if believed, would support the theory on which he relies. The flaw in his argument, however, is that the jury was not required to accept his testimony as true. The credibility of witnesses and the weight to be accorded testimony, even though uncontradicted, is for the jury, which may believe all the testimony of a witness or none, or may reject part and accept part. *State v. Emmons*, 595 S.W.2d 792, 795[5] (Mo.App.1980).

■ The jury could have reasonably found that (a) DeWalt went to work for ABC as a CETA employee in November, 1980, as evidenced by the contract dated November 12, 1980, (b) DeWalt did not work on all the dates for which ABC claimed reimbursement that month, as the lone paycheck was for $100 and total wages of $400 were reported to OGC, (c) DeWalt did not work for ABC in December, 1980, and January and February, 1981, (d) DeWalt filled out no time sheets at ABC during those three months, (e) Campbell knew DeWalt did not work at ABC those three months, (f) ABC paid no wages to DeWalt those three months, either in cash or by

---

2. Instruction 6, given by the trial court at Campbell's request, said:

"One of the issues in this case is whether the defendant acted in the honest belief that Joseph DeWalt had worked the hours indicated when the Defendant requested reimbursement from Rural Missouri, Inc. If the Defendant had such a belief, then he acted under a claim of right and must be found not guilty. The state has the burden of proving

beyond a reasonable doubt not only that the Defendant appropriated the property as alleged in the information but also that he did not do so under a claim of right.

If you find that the Defendant honestly believed that Joseph DeWalt had worked the hours indicated when the Defendant requested reimbursement from Rural Missouri, Inc., then he was acting under a claim of right and must be found not guilty."

check, (g) Campbell submitted requests for reimbursement to OGC for those three months, knowing ABC had paid DeWalt nothing, (h) when the investigation began in the spring of 1981, there were no documents to show payment to DeWalt of the wages for which reimbursement had been obtained, (i) when DeWalt reappeared at ABC in April, 1981, he signed a series of time sheets in blank, to be filled out to correspond with the dates for which ABC had claimed reimbursement, and he also signed a series of cash receipts, to be filled out according to the calculations made by witness Davis, and (j) that the time sheets and cash receipts were thereafter filled out with the data that appeared on them at trial.

The State argued this theory to the jury, and we find the evidence sufficient to support it. The following circumstances, in particular, are significant.

There was a week delay between the investigator's request to Campbell for the receipts showing DeWalt's "cash draws" and the time Campbell turned them over. The jury could reasonably infer that no such receipts existed when they were demanded, and were prepared during the ensuing week. Such an inference is bolstered by the fact that the receipts are not numbered.

Twenty-two time sheets, blank except for DeWalt's signature, were found in Campbell's desk a few weeks after Campbell left ABC. The jury could reasonably infer that after the investigation began, DeWalt signed a number of blank time sheets, that as many as were needed were filled out to show DeWalt worked the days and hours for which reimbursement had been received, and that the unused sheets were abandoned in Campbell's desk.

There were three different explanations about why DeWalt's employment by ABC ceased. Campbell testified he fired DeWalt because of poor attitude, tardiness, absenteeism and other undesirable traits. Ms. Merriman recalled talking to Campbell about why DeWalt "quit his job or left." RMI's records showed DeWalt was termi-

nated for a health reason. If DeWalt were fired, as Campbell testified, it is doubtful Campbell would have rehired DeWalt, as DeWalt testified.

ABC's request for reimbursement for November, 1980, was dated December 3, 1980. The request for December was dated January 12, 1981. Both showed DeWalt "unavailable" for signature, yet there were time sheets signed by DeWalt, purporting to have been filled out by him for weeks before and after the dates of these two requests. The absence of his signature on the November and December requests supports an inference that DeWalt was not at ABC at that time, and that the time sheets were not signed then, but later after the investigation began. The January request was not shown to DeWalt at trial, thus he had no opportunity to admit or deny the signature "Joseph E. DeWalt" thereon.

Campbell tried to persuade witness Reynolds not to tell the truth, and to recant Reynolds' statement to prosecuting officials. If a defendant threatens or attempts to persuade a potential witness to give false testimony, such a showing is properly receivable as evidence to establish defendant's guilt of the original charge and to show consciousness of guilt. *State v. Holman,* 556 S.W.2d 499, 508[25] (Mo.App.1977). Campbell argues there was no showing that his entreaties to Reynolds concerned DeWalt. We believe, however, that Reynolds' testimony was susceptible of such an inference, as well as others. Where different inferences are reasonably deducible, it is for the triers of the facts to determine which inference shall be drawn. *City of Kansas City v. Thorpe,* 499 S.W.2d 454, 459[9] (Mo. 1973), *cert. den.,* 416 U.S. 990, 94 S.Ct. 2398, 40 L.Ed.2d 768 (1974).

When the State's case rests upon circumstantial evidence, the facts and circumstances must be consistent with each other and with the hypothesis of the defendant's guilt, and they must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence. *State v. Franco,* 544 S.W.2d 533, 534[2] (Mo. banc 1976), *cert. den.,* 431 U.S. 957, 97 S.Ct. 2682, 53

L.Ed.2d 275 (1977). This rule is realistically tempered in its application, in that in a case involving circumstantial evidence the circumstances need not be absolutely conclusive of guilt, and need not demonstrate the impossibility of innocence; the mere existence of other possible hypotheses is not enough to remove the case from the jury. *State v. Franco,* supra, 544 S.W.2d at 534[3].

Applying these principles, we hold the trial court did not err in denying Campbell's motion for judgment of acquittal at the close of all the evidence and submitting the case to the jury. The evidence is sufficient to support the verdict.

Judgment affirmed.

GREENE, C.J., FLANIGAN, P.J., and TITUS, J., concur.