CROW, Judge.
Joni Thornton (“defendant”), tried by the court without a jury, was found guilty of the class B misdemeanor of property damage in the third degree, § 569.120, RSMo 1978,[1] and guilty of the class A misdemean- or of stealing, § 570.030, RSMo Cum.Supp. 1984.[2] She was sentenced to pay a fine of $500 on the property damage conviction (Count I), and to be imprisoned in jail for 90 days on the stealing conviction (Count II). Execution of the jail sentence was suspended and defendant was placed on supervised probation for two years, one of the conditions of probation being that she submit to a period of 15 days’ detention in jail. § 559.026, RSMo 1978.
Defendant appeals, briefing four assignments of error. One of them (Point 4) maintains that the evidence was insufficient to support a finding of guilty of either count.
Under Rule 27.01(b), Missouri Rules of Criminal Procedure (16th ed. 1985), the trial court’s findings have the force and effect of a jury verdict; consequently, appellate review is as though verdicts of guilty had been returned by a jury. State v. Giffin, 640 S.W.2d 128, 130[1] (Mo.1982). If there is substantial evidence to support the findings of the trial court, its judgment is to be affirmed. Id. In determining the sufficiency of the evidence, we accept as true all evidence in the record tending to prove defendant’s guilt, together with inferences favorable to the State that can reasonably be drawn therefrom, and we disregard all contrary evidence and inferences. Id. at 130[2]; State v. Hood, 680 S.W.2d 420, 423[4] (Mo.App.1984).
So viewed, the evidence establishes that the property that was allegedly damaged, and the items that were allegedly stolen, were located on an “acre and a quarter” tract of wilderness in the Hercules Glade area of the Mark Twain National Forest in Taney County. The tract lies adjacent to a field known as “Three Johns Field,” named after a school located there in years past.
Richard B. Crouch testified that he and Clovis Moore own the I’A acre tract “jointly.” Clovis Moore testified that “we” (otherwise unidentified) own the tract. The tract is used each year as a “deer camp.”
Crouch, who resides at Blue Eye, recounted that on Friday, November 2, 1984, he, accompanied by an elderly neighbor, A1 Illg, and a “Mr. Salari” (a bricklayer), went to the tract to “set up our deer camp.” As the tract is in a “designated wilderness area” where no motor vehicles are allowed, materials and supplies are usually brought in by horse-drawn wagon from Clovis Moore’s farm at Taneyville. The campsite, according to Moore, is “probably four and a half mile by wagon trail” from his farm.
Crouch explained that on November 2, because of “all the rain and the water and so forth the creek was too high to get through it with a wagon and team.” Therefore, said Crouch, “We drove around to the backside to the southside of it and walked in.” Crouch, Illg, and Salari were at the campsite “all day,” during which they “cleaned it up” and built a fireplace at a cost of $25. They departed “right around dark,” leaving behind a metal folding chair, a bow saw, and a hatchet, all belonging to Illg. They also left a lawn chair, three rakes, a shovel, an ax, and a “duffel bag” containing pots and pans.
Two days later, Sunday, November 4, Crouch returned to the site with his wife. *253 To get there, they drove to the edge of the wilderness area and walked north from there “a good mile” to the camp, where they were planning to meet Illg and his wife, Floradell, and Clovis Moore and his wife, Nancy. The Illgs and the Moores were coming in from the Moores’ farm north of the camp. Clovis Moore, A1 Illg and Floradell Illg had begun the journey in a horse-drawn wagon, followed by Nancy Moore on horseback. En route, however, Floradell Illg, described by Nancy Moore as a “very fragile” 70-year-old woman, had gotten “pretty sore,” so Nancy allowed Floradell to ride with Nancy on her horse, which was “just slowly walking.”
As Richard Crouch and his wife were crossing Three Johns Field near the campsite, Crouch heard “some hammering or beating or something like either a hatchet or a hammer” coming from the area of the camp. As they got closer, Crouch saw a man “walking north away from our camp.” Crouch had never seen this individual before. Crouch also saw “the leg of someone standing right back in the edge of the woods.” Crouch heard someone “clear their throat real loud.” Then, both individuals disappeared in the woods. Crouch saw neither individual again that day.
Crouch and his wife continued toward the camp, arriving there “[sjomewhere right around noon.” According to Crouch, it had required “20, 25 minutes” to walk to the camp from where they had parked.
When Crouch and his wife reached the camp, it was “completely destroyed.” Four trees “had been cut off about two to three foot above the ground and fell right in the middle of our camping area that we’d cleaned out.” The lawn chair had been forced down over one of the stumps so that the top of the stump protruded through the chair fabric. The handle of one of the rakes had been broken, the fireplace had been destroyed, and the pots and pans were at the bottom of the fireplace beneath some stones. Upon closer examination, Crouch discovered a bullet hole in the duffel bag and the pans.
Two rakes, the shovel, and the ax were missing. Also missing were A1 Illg’s metal folding chair, bow saw, and hatchet.
Meanwhile, Clovis Moore and A1 Illg were proceeding in the wagon along the trail toward the campsite. Moore testified that when they “were about 10 minutes out of camp coming in — we were going south coming in from the north from the farm,” he and Illg “run head-on with three people.” Moore identified the trio as (1) defendant, (2) Greg Thornton (defendant’s husband), and (3) Mark Gideon. Moore added that he had known all three “[e]ver since I’ve been in the Taneyville area.” Moore fixed the time of this confrontation as between 1:10 and 1:15 p.m.
According to Moore, defendant was carrying a rifle, and Greg Thornton “had a pistol strapped to his — on his hip.” Greg Thornton, said Moore, “had the tools and the chair and the hatchet.” Moore testified that Greg Thornton dropped those items “at the side of the road.”
After Moore and Illg had proceeded “probably a hundred foot” farther, Illg, according to Moore, said, “That was my tools and chair.” Moore attributed Illg’s delay in mentioning this to the fact that Illg has “Parkinson’s disease and he’s a slow talker and it takes him awhile to get things out.”
Illg corroborated Moore’s testimony about confronting defendant, Greg Thornton, and Mark Gideon on the trail. Illg identified all three at trial, as did Moore. Illg testified he saw “a chair laying on the ground by the one with the holster and a hatchet.” Illg recognized the chair and the hatchet as his property, explaining that at one time he had replaced the rubber caps on the chair legs because the caps had cracked and fallen off. Prior to November 4, the last time Illg had seen the chair and the hatchet was the day he had left them at the campsite. Illg confirmed that after he and Moore had “gotten down the trail a short distance,” he (Illg) had told Moore the chair and hatchet were his.
Nancy Moore recalled that she and Mrs. Illg were on horseback at least 100 yards *254 behind the wagon when defendant, Greg Thornton and Mark Gideon appeared. Nancy spoke to defendant, noticing that defendant was carrying a “deer rifle.” Nancy also spoke to Greg Thornton, observing that “he was stooping over picking up a chair and a hatchet.” At that time, Mrs. Illg told Nancy that the chair and hatchet belonged to Mr. Illg. Nancy thereupon said, “Greg, I’ll be back to get those,” thinking that the items had fallen off the wagon.
Greg Thornton, according to Nancy, responded, “They’re mine.”
Nancy pursued the matter no further with Greg Thornton, choosing instead to proceed toward the campsite.
Floradell Illg corroborated Nancy Moore’s testimony, and identified defendant, Greg Thornton, and Mark Gideon as the three individuals she and Nancy had seen on the trail.
Richard Crouch testified that the Moores and the Digs reached the campsite about 20 minutes after he and his wife had arrived. The Moores and the Illgs had come from the north. The two individuals Crouch had seen leaving the area as he and his wife had approached the camp had been walking north. The Moores told Crouch about seeing defendant, Greg Thornton, and Mark Gideon on the trail.
Clovis Moore, Nancy Moore, and A1 Illg corroborated Richard Crouch’s testimony about the destruction of the campsite.
After observing the damage, Clovis Moore, accompanied by Richard Crouch, walked south from the campsite to summon the sheriff. While they were gone, Nancy Moore rode back to the place where she had seen defendant, Greg Thornton, and Mark Gideon. There, Nancy saw two rakes and a shovel. Nancy left those items where they lay, rode back to the campsite, and waited for the sheriff.
Eventually, Deputy Sheriff Van Michel arrived. He and Nancy Moore rode Nancy’s horse to the place where Nancy had seen the rakes and shovel. Deputy Van Michel retrieved those three items, and he and Nancy returned to the campsite.
Richard Crouch identified one of the rakes as his, explaining that it “had a little piece missing off of the left-hand edge of it.” Crouch also identified the shovel as his, observing a hole that he had drilled to enable him to hang the shovel in his shed.
Crouch, who was unacquainted with Mark Gideon, was at Glen’s Market in For-syth with some companions about a week after the incident at the campsite. Crouch recognized an employee at the Market as the individual he (Crouch) had seen walking north from the camp on November 4. Crouch asked one of his companions who the employee was, and the companion identified the employee as Mark Gideon. At trial, at the instance of defendant, a man entered the courtroom and was identified by Crouch as the individual Crouch had seen near the campsite on November 4. Defense counsel announced that the man was Mark Gideon, and that the man would testify later to that effect.
At the close of the State’s evidence, defendant moved the trial court for a judgment of acquittal of both counts. The motion was denied. Defendant thereafter introduced evidence in her own behalf, thereby waiving any error with respect to the denial of the motion. State v. Green, 476 S.W.2d 567, 569[2] (Mo.1972); State v. Campbell, 655 S.W.2d 96, 97[1] (Mo.App.1983). Accordingly, the sufficiency of the evidence to support the findings of guilty will be determined upon the basis of all the evidence, including those portions of defendant’s evidence that favor the State. Campbell, 655 S.W.2d at 97; State v. Wood, 553 S.W.2d 333, 334[3] (Mo.App.1977).
Carl Thornton, the father of defendant’s husband, was called as a defense witness. He testified that his mother, Jessie McHaf-fie, owns land “surrounded” by National Forest. Three Johns. Field, according to Carl Thornton, is “a mile and a half” south of his mother’s property.
Carl Thornton explained that on Sunday, November 4, about 10:30 a.m., he left his *255 home, adjacent to his mother’s property, accompanied by four people: (1) his present wife, Patricia Kathlene Thornton, (2) his son, Greg, (3) defendant, and (4) Gary Butler, the husband of a daughter of Carl Thornton by his first marriage. According to Carl Thornton, the group went about a half mile to the east side of his mother’s property, where Greg Thornton rebuilt a deer stand for defendant, who had hunted there before.
While they were in that area, said Carl Thornton, he saw Clovis Moore and another person traveling across Jessie McHaffie’s property in a horse-drawn wagon. Carl Thornton also saw two women riding a horse. Carl Thornton explained that he was “70 to 80 yards” from the Moore wagon, and that he saw Clovis Moore “step off the wagon, walk up to the fence, his back was to me, and he was there just a very few seconds, turned around and got back on the wagon and drove through where the fence was at.”
After observing that, Carl Thornton and his son, Greg, walked over to the fence and saw that it “had been cut and just throwed back.”
Greg Thornton, defendant’s husband, corroborated his father’s testimony, explaining that he (Greg) recognized Clovis Moore, but did not know the man with Moore. Greg Thornton saw two women on a horse, and thought that one of them was Nancy Moore, but he was not certain. Greg had never seen the Moores’ companions before.
Greg Thornton testified he was surprised to see Clovis Moore coming across Jessie McHaffie’s property because she had a restraining order to keep Moore off her land. Greg Thornton testified that Moore came up to one of his grandmother’s barbed wire fences, got off the wagon, got back on the wagon, and went through the fence. A few seconds later, the horse and its riders went through. After the intruders departed, Greg Thornton accompanied his father to the fence, observing that it had been cut.
According to Greg Thornton, he and the others in his group then returned to his father’s home. Greg Thornton and Carl Thornton then went to Jessie McHaffie’s home, where Carl called the sheriff to report what Clovis Moore had done. Greg Thornton fixed the time of the phone call at “twelve to twelve-thirty.” Carl Thornton recalled it was “just a little after twelve-o’clock.”
It was stipulated that if Deputy Sheriff Van Michel were called as a witness, he would testify that on Sunday, November 4, he received a call from Carl Thornton between 12:00 and 12:30, complaining that certain individuals including Clovis Moore had crossed his mother’s property, headed into the National Forest.
Greg Thornton and Carl Thornton testified that they were unacquainted with the Illgs and the Crouches.
Greg Thornton conceded that defendant had a gun on November 4, but denied that he was carrying a pistol. He testified he did have a chrome handled hammer in a “hammer holder” on his right-hand side. Greg maintained that there was no contact between anyone in his group and Clovis or Nancy Moore or their companions. Greg admitted knowing Mark Gideon, but denied seeing Gideon that day.
Patricia Thornton, Gary Butler, and defendant also testified. Their testimony paralleled that of Carl Thornton and Greg Thornton.
Defendant conceded she was carrying a deer rifle on November 4, but denied that her husband was wearing a pistol. Defendant testified that she never left the property of her husband’s grandmother on November 4, and that she was never around a camp where there were any chairs, bags, pots, pans or rocks.
Lester Mark Gideon testified that he is employed at Glen’s Market in Forsyth, and that on November 5, 1984, Deputy Sheriff Van Michel questioned him about being in the National Forest the preceding day. Gideon testified that on November 4, he was at home in Forsyth until about 2:00 p.m., at which time he and his wife went to Rockaway Beach to eat. Gideon denied *256 seeing Greg Thornton, Carl Thornton, Patricia Thornton, or defendant on November 4. Gideon revealed that there is “another Mark Gideon” who works at Glen’s Market.
Another defense witness, Gregory Mark Gideon, testified that he works at Glen's Market, and that on November 4, 1984, he was near Bull Shoals working on a pickup at the home of one Jack Robinson. He denied seeing Greg Thornton that day.
We cannot ascertain from the record whether the man identified at trial by Richard Crouch as the individual he had seen walking north from the campsite on November 4, 1984, was Lester Mark Gideon or Gregory Mark Gideon.
At the close of all the evidence, defendant moved the trial court for a judgment of acquittal of both counts. The motion was denied. After final arguments, the trial court found defendant guilty of both counts, assessing the sentences heretofore mentioned.
In challenging the sufficiency of the evidence to support the findings of guilty, defendant maintains that the testimony of Lester Mark Gideon and Gregory Mark Gideon establishes that Richard Crouch was clearly mistaken in identifying the man he saw near the campsite on November 4, 1984, as Mark Gideon. The Moores and the Illgs, argues defendant, were likewise wrong in identifying the man accompanying defendant and her husband on the trail as Mark Gideon. Furthermore, says defendant, her denial of stealing the articles from the campsite and destroying other items there was corroborated by the testimony of four witnesses. Defendant adds that Deputy Sheriff Van Michel’s testimony regarding the time of day he received Carl Thornton’s telephone call complaining about Clovis Moore’s trespass is consistent with the testimony of the defense witnesses.
Pointing out that the State’s evidence placed her no closer to the crime scene than “about ten minutes out of camp,” defendant says that the evidence is too weak to permit a reasonable mind to believe beyond a reasonable doubt that she is guilty.
In considering defendant’s contentions, we are mindful that where the State, as it necessarily must do in this case, relies on circumstantial evidence to establish guilt, the facts and circumstances must not only be consistent with each other and with the hypothesis of guilt, but they must also be inconsistent with the defendant’s innocence and point so clearly and satisfactorily to guilt as to exclude every reasonable hypothesis of innocence. State v. Hankins, 642 S.W.2d 606, 614[10] (Mo.1982). However, the circumstances need not be absolutely conclusive of guilt, nor need they demonstrate the impossibility of innocence. State v. Goddard, 649 S.W.2d 882, 884[2] (Mo. banc 1983), cert. denied, 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 689 (1983).
In the record before us, the evidence supportive of the trial court’s findings establishes that defendant, Greg Thornton, and another man — whether he was Mark Gideon is unimportant — were within a ten minute wagon ride from the campsite on the day that the theft and the property damage were discovered. The evidence favorable to the State further establishes that at the time the trio was confronted by the Moores and the Illgs, Greg Thornton was carrying a metal folding chair and a hatchet belonging to Al Illg. One State’s witness, Clovis Moore, testified that he’saw Greg with “tools,” in addition to the chair and the hatchet. No one, however, testified that defendant was carrying any of the stolen items (or, for that matter, that the other man — whoever he was — was carrying any of the stolen items). According to all of the witnesses, the only thing defendant was carrying was a rifle.
We recall, of course, that after the destruction at the campsite was discovered, Nancy Moore returned to the place where the Moores and the Illgs had confronted defendant, Greg Thornton, and the other man, and found two rakes and a shovel there. The shovel and one of the rakes were positively identified by Richard Crouch as belonging to him. There is no *257 evidence, however, that defendant had carried the rakes and the shovel to the place Nancy Moore found them.
Admittedly, unexplained possession of recently stolen property is sufficient to sustain a conviction of stealing that property. State v. Chase, 444 S.W.2d 398, 402-03[4] (Mo. banc 1969); State v. Armstrong, 445 S.W.2d 367, 368[1] (Mo.1969). Moreover, the possession of recently stolen property which will support an inference of guilt may be a joint possession of the accused and others, and such possession need not be separated from all possession by others. State v. Arnold, 566 S.W.2d 185, 188[5] (Mo. banc 1978); State v. Miller, 485 S.W.2d 435, 439—40[3] (Mo.1972).
Here, however, there was no evidence that defendant had possession, either exclusively or jointly with her husband, of any stolen item. One could, of course, reasonably infer from Greg Thornton’s possession of Al Illg’s folding chair and hatchet that Greg had stolen those items at the campsite on the morning of November 4, 1984. It might also have been permissible to infer from (a) Clovis Moore’s testimony that Greg Thornton was also carrying some “tools,” (b) Nancy Moore’s testimony that she later found two rakes and a shovel at the place where the Moores and the Ulgs had seen Greg Thornton, defendant, and the other man, and (c) Richard Crouch’s identification of the shovel and one of the rakes, that Greg had also stolen those items.[3]
We find no authority, however, permitting an inference that defendant is guilty simply because she was with her husband when he was observed in possession of recently stolen property. The fact that she admitted being with her husband during the time when one could reasonably infer that he stole the property does not, in our view, permit an inference that defendant participated in the theft or in the destruction of the items at the campsite. Mere presence at the scene of a crime, coupled with an opportunity to have eom-mitted it, will not suffice to support a conviction. Arnold, 566 S.W.2d at 189[9]. Association alone does not permit an inference of guilt, nor does presence in the vicinity of the offense. State v. Cheatham, 458 S.W.2d 336, 339[2] (Mo.1970).
An inference that defendant was guilty of at least the theft might have been warranted if (a) defendant and Greg Thornton had been unaccompanied by the other man at the time the Moores and the Illgs confronted them on the trail, and (b) Greg Thornton, at that time, had been in possession of a stolen item of sufficient size that two persons would have been required to carry it. In such circumstances, a fact finder might have reasonably inferred that defendant had aided Greg Thornton in carrying the stolen item from the campsite, and had therefore been in joint possession of the stolen item. No such evidence was presented, however, in this case.
Regarding the property destruction charge, the only evidence suggesting that defendant was involved was her possession of the deer rifle. The State’s evidence, however, showed that Greg Thornton was carrying a pistol, and there was no indication whether the bullet holes in the duffel bag and pans had been caused by a rifle or a pistol. There was, moreover, no evidence that defendant’s rifle had been fired that day.
Even defendant’s evidence that she had the only firearm in her group does not, in our view, supply sufficient proof to support a finding that she shot the holes in the duffel bag and pans. As already noted, there was no evidence that defendant’s rifle had been fired that day. Additionally, Clovis Moore testified “[tjhere’s always hunters in there, there’s always hikers in there.” Defendant’s evidence did not ajd the State in that aspect of the case, as defendant’s evidence did not negate the possibility that the crimes had been committed by someone other than defendant. Greg Thornton testified he saw “hikers and hunters” in the area on November 4.
*258 In sum, while the evidence may well leave one with a strong suspicion that defendant was involved in one, or perhaps both, of the offenses at the campsite, we cannot say that the evidence excludes every reasonable hypothesis of innocence. On the contrary, a trier of fact could have reasonably found from the evidence that defendant, even if present with her husband at the campsite, declined to participate in any criminal activity there.
We therefore hold that the trial court erred in denying defendant’s motion for a judgment of acquittal of both counts at the close of all of the evidence. Consequently, the judgment must be reversed. That being so, we need not address defendant’s other assignments of error.
Inasmuch as the reversal is because of lack of sufficient evidence to support the trial court’s findings of guilty, the State is barred from subjecting defendant to a second trial on these charges. Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); State v. Basham, 568 S.W.2d 518, 521 [3] (Mo. banc 1978). Accordingly, the judgment is reversed outright and defendant is ordered discharged.
PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.

. The property allegedly damaged consisted of “trees, a stone fireplace, a lawn chair and pots and pans."

. The property allegedly stolen consisted of “a hatchet, chair and some tools.”

. Greg Thornton was charged with the same two crimes as defendant, was tried simultaneously with defendant, and was found guilty of the same two crimes as defendant. He likewise appealed, but later dismissed his appeal.