**STATE of Missouri, Respondent,**

v.

**Ronnie HANKINS, a/k/a Cecil Hankins, Appellant.**

No. 62307.

Supreme Court of Missouri, Division No. 2.

Dec. 3, 1982.

Rehearing Denied as Modified on Court's Own Motion Jan. 11, 1983.

Application for Transfer to Court En Banc Denied Jan. 11, 1983.

Appellant's Pro Se Motion for Reconsideration Denied Jan. 11, 1983.

J. Miles Sweeney, Springfield, for appellant.

John Ashcroft, Atty. Gen., Nancy Kelley Baker, Asst. Atty. Gen., Jefferson City, for respondent.

ALDEN A. STOCKARD, Senior Judge.

Appellant was found guilty by a jury of capital murder, § 565.001 RSMo 1978, and was sentenced to life imprisonment without eligibility for probation or parole for fifty years.

Appellant contends that the trial court erred in failing to sustain his motion for judgment of acquittal at the close of all the evidence. This necessitates a rather detailed statement of the evidence.

On February 12, 1979, when appellant returned to his home in Springfield, Missouri he saw police cars at his house. He then drove to his brother's house and called Sharon Walburn, with whom he had resided for several years, and asked her why the police were after him. During the conversation appellant stated to Sharon that he was "tired of running" and that he would "just go out and get drunk," and if the police stopped him, he would "have it out with them." He also stated that he "thought about doing a guy in * * * a guy off the railroad tracks, but that he couldn't do it because it wouldn't look like him."

On February 14, appellant and his brother, Billy Hankins, drove to Sparta, Missouri, where appellant withdrew $800 from his savings account at the Citizens Bank of Sparta, leaving a balance of $36.17. He also made two withdrawals from a checking account, one for $63.00 and the other for $200, leaving a balance of $15.25. Appellant and his brother then returned to Springfield, and appellant called his mother and asked her to "watch his two kids." He "indicated that he was going to do an armed robbery." Appellant's brother took the children to his sister's home in Springfield where his mother was staying.

Appellant had a ¾ ton black Ford pickup truck and he asked his brother to follow him. Billy was driving a yellow Charger. They drove to Oldfield, then to UU Highway about seven miles from T Highway to a wooded area. Appellant backed the yellow Charger into the woods, and he and Billy then got into the Ford pickup and returned to Billy's home in Springfield, arriving about 6:15 p.m. Appellant again called his mother and Billy heard appellant again ask her if she would "take care of his kids" and he "indicated to her that he was going to do an armed robbery," and that "he'd just shoot it out with them." He then left in the pickup truck. While returning to Springfield, Billy noted that there was "a .30–.30 rifle, a shotgun and a gas can" in the pickup truck. Appellant returned to Billy's home about 2:30 or 2:45 the next morning. According to Billy, appellant "smelled a little like gas." Appellant took a bath and changed clothes. When he returned to Billy's house he was driving the yellow Charger which he and Billy earlier that day had left on Highway VV in a wooded area. He did not say anything as to the whereabouts of the pickup truck. Appellant and Billy drove to Sharon's house in Springfield, but did not stop, and they then drove to Fort Leonard Wood to the bus depot where appellant bought a ticket for Twin Falls, Idaho, and gave his name as Michael Hatcher. Billy left appellant at the bus station and returned to Springfield in the Charger arriving about 10:00 a.m. on February 15. About 4:00 o'clock that afternoon appellant called Billy from Kansas City and said that if anyone asked, he, Billy, was to say that he "hadn't seen [appellant] or talked to him since 3:00 o'clock Wednesday afternoon."

Oliver Hankins, appellant's father, lived in Springfield with Sara Fara, his former spouse, during the winter of 1979. Oliver was well acquainted with Otis Ray whom he considered to be an "awful good friend." These two men would frequently drink together. On February 14, they purchased some wine at the Brown Derby Liquor Store on Grant and Commercial Streets, and went to the end of a viaduct to drink the wine. When it was "just getting a little dusky," they decided to go to their respective homes. Oliver saw Ray walk towards the Brown Derby, cross the street, and then get into a black pickup truck which had pulled up as Ray was walking towards the Brown Derby. Oliver never saw Otis Ray again although it was their custom to see each other once or twice a week.

About midnight of February 14, 1979, Randy Hodges was on his way home when he observed a black Ford pickup truck on Highway VV about a half a mile from his house which was burning, and he called the sheriff. He searched the path the truck had taken from the highway but was unable to find anyone. He could not go near the truck because of the intense heat. Bill Ramsey from the Christian County Sheriff's office arrived at the scene about 2:00 o'clock a.m. The cab of the truck was then completely burned, and inside the cab on the floor was what appeared to be a badly burned human body. A 2½ gallon gasoline can was in the cab. The coroner later removed the body from the truck, and the truck was towed to a garage.

Appellant's first point is that the trial court erred in refusing to suppress the testimony of Oliver Hankins because "it had been gained through the coercion of [him] by the Associate Circuit Judge during the preliminary hearing, and by the coercion of [him] by the prosecuting attorney in that the prosecuting attorney kept [him] in jail on a perjury charge until he submitted to a deposition [in which he recanted] his testimony at the preliminary hearing."

The transcript of the preliminary hearing has been filed with this Court, but not as an exhibit in the trial. Its status with this Court is not clear. In the transcript of the trial the court noted that there was before the Court "a stipulation as to certain facts, and * * * a motion to suppress, and [that] this stipulation as to certain facts goes to this motion." The Court then commented that the parties agreed that it could look at the motion and read the stipulation in order to make its ruling. We do not have before us the contents of the motion to suppress, nor do we have a copy of the stipulation of facts.

We have read the parts of the transcript of the preliminary hearing referred to by appellant in his brief. It is there shown that Oliver Hankins, appellant's father, testified that he had been acquainted with Otis Ray for more than fifteen years, and that they would "drink a lot together." He tes-tified that in February of 1979 he and Otis Ray went under a railroad overpass and "drank pretty near a pint of wine" and then parted, he going to the north and Otis Ray going back towards the Brown Derby. He testified that he "never seen him [Otis Ray] after he come out of the subway," and that he did not see him get into an automobile with anyone.

■ At trial, Oliver Hankins was not available to testify, but a deposition previously given by him was read to the jury. The propriety of its use is discussed infra. In that deposition, Mr. Hankins testified that Otis Ray was an "awful good friend" and that they frequently drank together. He further testified that the last time he saw Otis Ray they drank a little over a pint of wine together at "the end of the subway," and that he then saw Otis get in a black pickup truck which was being driven by appellant.

On cross-examination Oliver Hankins testified by deposition that after his testimony at the preliminary hearing he was charged with perjury, was then put in jail, and had remained in jail until the day of the deposition. He further testified that he did not know what the prosecutor would do as the result of his testimony on deposition. On redirect examination he testified that no threats had been made or promises given to him for his testimony. It was stipulated that on the day his deposition was taken, he appeared before the Associate Circuit Judge and was released on his own recognizance, and that no preliminary hearing on the perjury charge had been held.

The allegations of appellant that Oliver Hankins was improperly coerced to change his testimony are based on speculation and conjecture and are not supported by the record before this Court. We note that appellant does not assert that the testimony of Oliver Hankins given on his deposition was false. We find no basis in appellant's first point for reversal of the judgment.

■ Appellant next asserts that the trial court erred on two occasions when it refused to declare a mistrial when he was

"viewed by members of the jury in hand-cuffs and chains." Appellant argues that a jury "would naturally be more inclined to view [him] as guilty if he was [so] displayed."

The first incident occurred prior to trial. Appellant was taken by the sheriff from the Christian County Court House in Ozark, Missouri to the Douglas County Court House in Ava, Missouri. During such transportation he was placed in handcuffs with a chain around his waist. He was taken to the main entrance of the Douglas County Court House and up the steps. Appellant testified that "there was jurors standing on the steps all the way around when I came through." We note the jury had not yet been selected. Appellant was then taken into the courtroom where the handcuffs and chain were immediately removed. Appellant testified that there were "people" in the courtroom but he did not know whether they were jurors. No one said anything to him and he said nothing to anyone. The second incident occurred the following day at the break for lunch when appellant, while wearing handcuffs, was taken on the way to the sheriff's office down to the north entrance of the courthouse where four or five of the jurors were standing.

This does not present the situation as in *State v. Borman,* 529 S.W.2d 192 (Mo.App. 1975), where the defendant sat in the courtroom during his trial in handcuffs. The officers charged with the custody of an accused may take reasonable precautions to maintain that custody. *State v. Fields,* 487 S.W.2d 560 (Mo.1972); *State v. Edmonson,* 371 S.W.2d 273, 277 (Mo.1963). In doing so, as stated in *United States v. Leach,* 429 F.2d 956, 962 (8th Cir.1970), "[i]t is a normal and regular as well as a highly desirable and necessary practice to handcuff prisoners when they are being taken from one place to another, and the jury is aware of this." We find nothing to indicate that the officers charged with the custody of appellant exceeded their right to take the reasonable necessary precautions for the maintenance of order and the retention of custody during the progress of the trial. *State v. Carter,* 557 S.W.2d 47 (Mo.App.1977); *State*

*v. Crawford,* 539 S.W.2d 633 (Mo.App.1976); *State v. Neely,* 524 S.W.2d 886 (Mo.App. 1975); and *State v. Johnstone,* 335 S.W.2d 199, 205 (Mo.1960).

■ Appellant next asserts that the trial court erred in permitting the deposition of Oliver Hankins to be read into evidence for the reason that (a) the court made no determination "under Criminal Rule 25.14 that it was necessary for the State to take the deposition" in order to preserve the testimony, and the court further failed "to make such orders as would fully protect the right of personal confrontation and cross-examination of the witness by defendant;" and (b) the State failed to prove it had made a good faith effort to obtain the presence of the witness at the trial.

Appellant does not contend that he was not present during the taking of the deposition, and it is clear that he and his attorney were present and that his attorney extensively cross-examined the witness. Art. I, § 18(b), Constitution of Missouri, authorizes in a felony case the taking and use of the deposition of a witness, other than the defendant and spouse, in order to preserve testimony after a hearing and finding by the circuit court that such is necessary to preserve the testimony. It is further provided that the court make such orders as will fully protect the rights of personal confrontation and cross-examination of the witness by the defendant. Rule 25.14 implements this constitutional provision in substantially the same language. The record in this case does not affirmatively show that a hearing was held and that a finding was made by the circuit court that the deposition was necessary to preserve the testimony of Oliver Hankins, or that any orders were made to preserve appellant the right of personal confrontation of the witness. In argument appellant admits that he was "allowed his cross-examination." He does not argue on this appeal that he was in any way denied or restricted in his right of cross-examination. *See State v. Jackson,* 495 S.W.2d 80 (Mo.App.1973). He does assert that "whether the deposition

was necessary" is "open to speculation." However, at the time the deposition was offered in evidence the only objection made was that "there's been no showing that he [the witness] is unavailable."

" 'A litigant may not shift or broaden his trial objection on appeal.' " *State v. Barnes,* 543 S.W.2d 557, 559 (Mo.App.1976), quoting from *State v. Adams,* 531 S.W.2d 763 (Mo.App.1975). Therefore, the issue of whether the deposition was necessary and the other issues (other than whether it had been shown that the witness was not available) are not preserved for appellate review and our examination discloses no plain error within the meaning of Rule 29.12(b).

■ When appellant objected that there had been no showing that the witness was not available, the trial court heard argument and the comments of counsel on that issue. It was developed that a week had passed since the subpoena for Oliver Hankins had been sent from Christian County to Greene County where Hankins regularly resided, but there had been no service. The officers were still looking for him and had checked at two addresses where he might be. One was the residence of a former wife, and the other was the residence of a son with whom he was reported to be living. The prosecutor advised the court "that at this very time and all morning we have the Springfield City Policemen, Missouri Highway Patrolmen, and Greene County Deputy Sheriffs trying to locate Mr. Hankins." The officers had also checked at various places where he was known to frequent. Appellant's counsel stated to the court that a person (whom he referred to as the wife of Oliver Hankins) had told him that she had seen Hankins two days previously, but he did not state where he was seen, and he gave no information where he could then be found, or where the officers should look for him.

This is not the case, as was in *State v. Brookins,* 478 S.W.2d 372 (Mo.1972), where the whereabouts of the witness was known but no good faith effort was made to obtain his presence at the trial by use of authorized procedures. In this case the witness could not be found. The trial court heard the recital of facts and ruled that "[i]f Mr. Hankins fails to show up and if you [the prosecutor] offer the deposition in lieu of his personal testimony, the Court will overrule your objections and will permit the deposition to be read." The findings of the trial court are to the effect that under the circumstances the witness was not available and that there had been a good faith effort to obtain his presence. These findings are supported by substantial evidence. We find no prejudicial error in permitting the use of the deposition at trial.

Appellant next asserts it was error to permit the testimony of Sharon Walburn over his objection on the basis that she was his common law wife.

Sharon Walburn testified as a witness for the State over the objection of appellant that she was his common law wife. After hearing evidence on the issue of whether Sharon Walburn was a competent witness the court overruled appellant's objection.

■ At common law a husband or wife was not a competent witness to testify either for or against the other spouse, nor was one spouse allowed to divulge confidential communications arising out of the marriage relationship. *State v. Euell,* 583 S.W.2d 173, 175 (Mo. banc 1979). Section 546.260 RSMo 1979, removed the common law disability by permitting one spouse to testify on behalf of the other "at the option of the defendant spouse" in a criminal case; but the statute specifically retains the confidential communications privilege, "provided, that in no case shall husband or wife, when testifying under the provisions of this section for a defendant, be permitted to disclose confidential communications had or made between them in the relation of such husband and wife." This statute applies to the testimony of an individual if he or she is married to the defendant at the time of the trial. *State v. Euell, supra; State v. Nolan,* 316 S.W.2d 630 (Mo.1958). Whether appellant and Sharon Walburn were married was a factual issue for the determination of the court.

Appellant met Sharon in Idaho about six years prior to trial and started "living" with her although he was then married to a person by the name of Teresa. He was divorced from Teresa in 1974 and he continued to live with Sharon, by whom he had a child. During that time he supported Sharon and her children. Both agreed to this living arrangement, and Sharon used the name Hankins, but as she testified, apparently mistakenly, that she did so because "[i]t was a law in Idaho that if we lived there, you know, we'd have to use Hankins." She also testified that she used the name Hankins because it was "convenient," "less embarrassing," and because of the "kids and everything" it was easier. She further testified that when she and appellant first met they "were going to get married, and we decided we didn't want to," and that she "consciously decided" she did not want to get married, and decided that she wanted to live together with appellant. When asked by the court, "[d]id you consider yourself married?" she replied: "I just considered myself living with him." When asked by the prosecutor if she consented to be his wife, she replied, "No." However, when asked by appellant's counsel if she considered herself "to be his common law wife," she gave the legal conclusion, "Yes." She and appellant returned to Missouri in 1975 or 1976. She testified that when she "went on ADC" she took her ADC check and "paid the rent" but before that appellant had done so. When she applied for ADC she stated that appellant was the father of one of her children, but she did not claim that appellant was her husband. When she and appellant terminated their relationship, he "just left," and she never considered that she needed to obtain a divorce if she did not want to be with him.

Appellant testified that he started living with Sharon "when [he] got the divorce" from Teresa, but he admitted that he had "already moved in then." He stated when he lived with Sharon he considered them to be husband and wife, that he assumed all the responsibilities of a husband, that he provided for Sharon and the children, and that he had a child by her.

In *Hamby v. Simplat Company,* 94 Idaho 794, 498 P.2d 1267 (1972), it is stated that "a common-law marriage arises where 'the consent of the parties capable of making it is followed by a mutual assumption of marital rights, duties or obligations.'" Whether the parties consented to create a marriage is a factual issue. There was some conflicting evidence, but the trial court, as the finder of fact, was to determine any credibility question. The finding by the trial court that Sharon was a competent witness is clearly supported by the evidence, and we find no error in the court's ruling on appellant's objection of her competency.

Appellant next contends error resulted from the refusal on two occasions of the court to grant a mistrial and its failure to admonish the jury to disregard certain testimony of Billy Hankins.

The first incident occurred as follows:
Q. [By Mr. Appleby] Now, have you testified in any proceeding before that had to do with your brother?
A. Yes, sir.

* * * * * *

Q. What was it?
A. It was a felonious assault deal.
*Mr. Appleby:* Well judge, I ask that be stricken I'm not sure what that is.

Appellant requested a mistrial but did not request any other relief. We find no other reference in the record to the felonious assault.

The second incident occurred as follows:
Q. [By Mr. Appleby] Did you see or talk to him [Appellant] on the 13th?
A. Well, we was there together about all day.
Q. Did you have any conversations with him on that day?
A. Yes.
Q. Do you happen to recall anything he said?
A. Yes.
Q. What was that?
A. (Witness ponders)—Well, he discussed an armed robbery with me.

Appellant objected without stating any reason, and he then requested a mistrial. No other relief was requested.

In each case there was only an indirect inference that appellant committed the felonious assault and the armed robbery. See *State v. Brunson,* 555 S.W.2d 359 (Mo.App. 1977). In each case the statement was volunteered. A mistrial, which was the only relief requested, is a drastic remedy, and when a witness volunteers a statement which would normally be inadmissible, "the trial judge has a duty to evaluate the whole situation to ascertain whether some other remedy short of [granting a mistrial] will cure the error." *State v. Walker,* 531 S.W.2d 55, 57 (Mo.App.1975). Not only did this situation not require the drastic result of a mistrial, it was not the kind of situation which called for action on the part of the trial court without a request. Under the total circumstances we find no abuse of discretion on the part of the trial court in not granting a mistrial.

■ Appellant contends the trial court erred in admitting into evidence State's Exhibit 12 which consisted of x-rays and in permitting a doctor "to testify based on those x-rays" for the reason (a) that the x-rays were not properly identified "as being the x-rays of the same person which was the subject of earlier testimony," and (b) were not identified "as being those of the individual named in the State's information."

We assume that the "subject of earlier testimony" was Otis Ray. The x-rays were admitted under the Uniform Business Records Act, and were identified as "facial x-rays" of Otis Ray taken at the Cox Medical Center. Dr. Thomas Collins, an oral surgeon, made a comparison of the x-rays with tooth root fragments found in the black pickup truck. He testified that he "examined the individual root fragments * * * and compared them to the x-rays * * and found that the root fragments were consistent with what I found on the x-rays. They could be from the same person." He further stated in his opinion the tooth fragments were from Otis Ray.

The x-rays were clearly identified as being "facial" x-rays of Otis Ray. We find no merit to this contention of error.

Appellant's final point is that the court erred in denying his motion for judgment of acquittal because the State (a) failed to prove in what county the body died; (b) failed to prove the identity of the body and that it died through criminal agency; (c) failed to prove the body died on or about February 15, 1979 as alleged; and (d) failed to prove "any connection" between appellant and the alleged decedent "at any relevant point of time."

We shall here set forth various circumstances which a jury was authorized to find existed and could be considered. Appellant was having some problem with the law as evidenced by the police being at his home when he returned on February 12, 1979. Appellant made statements to the effect that he had "thought about doing a guy in," possibly "a guy off the railroad tracks." On February 14, 1979 appellant withdrew a substantial sum of money from two accounts at the Sparta bank, and then he and his brother drove appellant's black pickup truck and a yellow Charger to an isolated spot on UU Highway where they left the Charger in the woods off the highway. Appellant and his brother then returned to Springfield in the black pickup truck and appellant left his brother at his home. At that time there was a gasoline can in the truck. About 2:30 o'clock the next morning appellant returned to his brother's home in the yellow Charger, not the black pickup truck, in a disarrayed state and smelling of gasoline. Appellant then had his brother drive him to the bus station at Fort Leonard Wood, and using the name of Michael Hatcher he purchased a bus ticket to Twin Falls, Idaho. This consisted of flight under a false name, both constituting evidence of guilt. Later that day he called his brother from Kansas City and told him that if anyone asked questions to say that he had not seen appellant since 3:00 o'clock of the afternoon of Wednesday, which was February 14. Apparently appellant wanted to be certain that no one would say they saw him alive after the pickup truck burned.

On an undisclosed afternoon about dusk, but on a cold day, appellant's father and Otis Ray, a wine drinking companion, parted company, and appellant's father saw Otis Ray get into appellant's black pickup truck. This was the last time he was seen alive by anyone. About midnight appellant's black pickup truck was found at the same location where the Yellow Charter had been left in the woods that afternoon. The truck was on fire. On the road where the truck had left the highway, there were three spots in the asphalt about the size of the bottom of a five gallon can. These spots were caused by the presence of a substance with low molecular hydrocarbon profile consistent with gasoline. In the truck was the body of a human being burned beyond recognition, and there was no indication as to how the decedent met his death except by fire. Fragments of sixteen teeth found in the truck were shown by comparison to previously made x-rays to have been teeth of Otis Ray. The x-rays showed that Otis Ray had only sixteen or seventeen teeth.

Where the State, as it necessarily must do in this case, relies upon circumstantial evidence to establish the guilt of the accused, the facts and circumstances relied upon by the State must not only be consistent with each other and with the hypothesis of guilt, but must also be inconsistent with his innocence and point so clearly and satisfactorily to guilt to exclude every reasonable hypothesis of innocence. *State v. Paglino,* 319 S.W.2d 613, 622 (Mo. 1958). Every factual circumstance set forth by appellant as lacking in proof may be proved by circumstantial evidence. *See State v. Valentine,* 506 S.W.2d 406 (Mo. 1974); *State v. Jenkins,* 516 S.W.2d 522 (Mo.App.1974); *State v. Rizor,* 353 Mo. 368, 182 S.W.2d 525 (1944); *Holtkamp v. State,* 588 S.W.2d 183 (Mo.App.1979). The circumstances disclosed by the evidence, and as set out above, are consistent with each other and with the hypothesis of appellant's guilt. Also, these circumstances are completely inconsistent with innocence, and we are convinced that they so clearly and satisfactorily point to the guilt of appellant that they exclude every reasonable hypothesis of his innocence. The trial court did not err in refusing to enter a judgment of acquittal.

The judgment is affirmed.

WELLIVER, P.J., and HIGGINS and SEILER, JJ., concur.