OPINION OF THE COURT
Jaunita Bing Newton, J.
The court, in the case at bar, must determine the availability of the marital privilege in the context of a criminal *96 proceeding in which one "spouse” is the defendant.[1] Surprisingly, there is a dearth of reported case law on the topic as it relates to the facts of this case. That is, where the couple live together in an admittedly nonformalized relationship and a colorable argument can be made for the existence of a common-law marriage.
The defendant and Wanda Silva met on or about October 2, 1983. They have lived together since early 1984 without the benefit of a civil or religious ceremony. The couple has two children together and Ms. Silva’s daughter from a previous relationship lives with them. Indeed, the defendant in his moving papers has annexed documentation which allegedly demonstrates that this child also refers to him as her father.
In early 1985, the defendant and Ms. Silva made an extended visit to the home of defendant’s brother, Douglas Suarez, in Sidney, Ohio. For the purposes of this motion, it is alleged that during this 2-to-3-week stay in Ohio, the couple reaffirmed their commitment to each other and exchanged vows. The question of whether the couple, during this exchange of vows in Ohio indicated a present intent to be married, is relevant to the motion before the court.
The defendant moves this court for an order pursuant to CPLR 4502 (b) precluding the People from introducing, at trial, certain statements made by him, including an alleged admission that he shot the deceased, to Wanda Silva, on the grounds that such statements are inadmissible as privileged confidential communications.
Our courts and Legislatures have, since the mid-1800’s, recognized the need to protect, as an evidentiary privilege, certain interspousal communications.[2] The public policy rationale for creation of the privilege was the need to encourage marital confidences free from State intrusion. Moreover, the privilege would foster the goals of the institution of marriage by enabling couples to communicate deepest feelings to each other without fear of eventual exposure in court.
Major developments in the area of marital privilege, include the congressional enactment of rule 26 of the Federal Rules of *97 Criminal Procedure in 1946 which left the interpretation of the privilege to the courts; and the 1975 enactment of Federal Rules of Evidence rule 501, which permits Federal courts to interpret the common law "in the light of reason and experience” except in cases governed by State substantive law in which State law privileges apply.[3]
Presently, New York affords a marital privilege in both civil and criminal cases. For the purposes of this discussion, the availability of the privilege in a criminal case will be examined.
CPL 60.10 and CPLR 4502 (b) are the applicable statutory provisions. These statutes and the relevant case law dictate that the invocation of the marital privilege requires the existence of a marital relationship at the time of the subject communication.[4] Query, can the defendant in the instant case who has lived with Wanda Silva without the benefit of a ceremonial marriage, invoke the marital privilege?
To answer that question the court must first determine whether the couple was married at the time of the communication and secondly determine whether the statement was induced by defendant’s absolute confidence in the marital relationship. Here, I find that the defendant’s statement satisfies the second prong of the test. That is, it was made in confidence and induced by his confidence in the marital relationship. Accordingly, if it is determined that the couple was married at the time of the subject communication then theoretically the privilege would be available.
In support of his position that the couple was married at the time the statement was made, the defendant proffers the following arguments. First, that his relationship with Ms. Silva follows their Puerto Rican customary practice of living together and often raising children together without the benefit of a formal marriage. Secondly, defendant argues that his relationship with Ms. Silva is a common-law marriage which should be recognized in New York by virtue of their visit to Ohio in 1985. Lastly, the defendant urges the court to adopt *98 the reasoning set forth in Braschi v Stahl Assocs. Co. (74 NY2d 201) and to expand the definition of a familial relationship. Defendant represents that such extension would characterize his family relationship as a marriage.
The court finds the defendant’s argument with respect to cultural legitimization of defendant’s marriage unavailing. To support a finding of privilege solely on the heritage or culture of the movant would lead to varied, ad hoc determinations, and eventual discriminatory effects that would afford certain groups greater protection than others. I decline further comment on that subject. Persuasive, however, are defendant’s remaining arguments, which the court will address in seriatim.
Although common-law marriages have been proscribed in New York since 1933 (see, L 1933, ch 606, § 1, eff Apr. 29, 1933), New York will recognize as valid a common-law marriage contracted in a jurisdiction which permits such marriages. (Matter of Tabler, 73 AD2d 101.) Ohio is one the States which recognizes common-law marriages, provided certain criteria are met. New York, through application of Ohio law, will recognize a valid Ohio common-law marriage. Therefore, if the defendant entered into a valid common-law marriage in Ohio, New York will give that marriage full force and effect.
The criteria for a valid Ohio common-law marriage are as follows: (1) mutual agreement made by competent parties to marry in praesenti; (2) proof of cohabitation, as husband and wife, following the agreement; (3) the couple holding themselves out as man and wife in the community in which they reside; (4) the couple having the reputation of husband and wife in that community (Ohio Rev Code Annot § 3105.12).
Defendant, in his moving papers, has, at the very least, established the need for the court to conduct an evidentiary hearing on the issue of whether defendant’s particular relationship satisfies the above criteria. Inasmuch as the defendant is seeking to establish the existence of a valid common-law marriage, he has the burden of proving that the marriage existed. (Matter of Benjamin, 34 NY2d 27 [1974].) The evidentiary hearing would afford the court the opportunity to question, under oath, Wanda Silva, Douglas Suarez, or other witnesses regarding this "marriage” in an effort to determine whether the defendant has sustained his burden of proof and whether the marital privilege would be available to him.
Assuming arguendo that at the conclusion of the hearing *99 the court finds that there was no common-law marriage, the court, upon statutory and decisional authority, would be compelled to find that the witness’s testimony does not involve privileged communication and is therefore admissible at trial.
Defendant contends that even in the absence of a valid Ohio common-law marriage, the court should nonetheless grant the relief requested because his relationship with Wanda Silva is entitled to the protection accorded to family members as enunciated in Braschi v Stahl Assocs. Co. (supra). The court disagrees. Braschi is distinguished from the case at bar on several grounds but, principally because the two cases have bases in different public policy concerns. In Braschi, the court addressed the proprietary interest of a long-term tenant in an apartment whereas here, the court must be guided by the broader social goals which pit fundamental evidentiary issues against a desire to protect the institution of marriage. Without making a value judgment, I submit these are very different interests that society seeks to protect.
Nonetheless, defendant’s arguments are consistent with the recent demands for a change in the law of privilege. There is one school of thought which suggests expansion of the privilege to any persons involved in intimate relationships. The other seeks total abolishment of the marital privilege as an outmoded and ineffective rule which undermines the judicial search for the truth.
Proponents of extending the privilege argue that marriage should not be treated any differently from other intimate relationships. Moreover, they maintain that the law should respect the individual’s choice of an intimate relationship, be it a marriage or something else. (See, Note, Developments in the Law — Privileged Communications, 98 Harv L Rev 1450, 1590 [1985].)
While the court recognizes and appreciates the fact that there are nonformalized relationships where the parties have a bond of intimacy similar to or greater than that between married couples, I find that it is improvident for the judiciary to extend the privilege to such relationships. Cogent arguments may be made for a privilege to apply to relationships between gay partners, roommates, friends, co-workers, or other family members. Indeed, the relationships to which the privilege could apply are diverse. The Legislature, and not the court, should be the body to determine which particular relationships should be afforded this extraordinary protection.
*100 The decision in Braschi (supra) does not require a different result. The defendant is correct that the Braschi court extended to nonblood relationships the same rights afforded to family members related by blood. That ruling is quite specific and was tailored to effectuate the purposes of the rent control laws and the intent of the Legislature. Indeed, the court found that "rent-control laws are remedial in nature and designed to promote the public good, their provisions should be interpreted broadly to effectuate their purposes” (supra, at 208). The decision did not hold that every legal rule or statute which applies to family members or spouses would hereafter apply to all persons having intimate or family-like relationships.
Similarly, the court declines to agree with those who propose abolition of the marital privilege. Abolitionists argue that the privilege hampers the finder of fact’s search for the truth without serving its stated goal of strengthening the institution of marriage. The court opines that the marital privilege has laudable goals and side effects and should therefore be maintained.
In conclusion, the availability of the confidential marital communication privilege to the statements allegedly made by the defendant to Wanda Silva can only be determined based upon the testimony adduced at an evidentiary hearing regarding the existence of a valid Ohio common-law marriage.

. What is euphemistically known as the marital privilege had its underpinnings as two distinct privileges: the adverse testimony privilege and the confidential marital communications privilege. It is the latter upon which this opinion will focus.

. The confidential communication privilege began to emerge as a separate privilege after the 1933 abolishment of the spousal disqualification, wherein one spouse was incompetent to testify against the other spouse.

. See also, Wolfle v United States, 291 US 7 (1934); Blau v United States, 340 US 332 (1951).

. See, e.g., People v Torres, 90 Misc 2d 358 (the court refused to grant the privilege regardless of the marital characteristics of the relationship); United States v Byrd, 750 F2d 585 (the court did not extend the privilege to a permanently separated couple); State v Hankins, 642 SW2d 606 (Mo) (couple had children and had been living together for six years and woman sometimes used man’s name yet court refused to grant the privilege).