

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD81606 |
| | ) | |
| DAIRIAN E. STANLEY, | ) | Opinion filed: September 15, 2020 |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**THE HONORABLE CHARLES H. MCKENZIE, JUDGE**

Division Two: Karen King Mitchell, Presiding Judge,
Anthony Rex Gabbert, Judge and W. Douglas Thomson, Judge

Dairian Stanley ("Stanley") appeals from his convictions of murder in the first degree and armed criminal action following a jury trial. On appeal, Stanley claims the trial court plainly erred in: (1) compelling Victim[1] to testify over her assertion of marital privilege; (2) allowing Stanley to represent himself while his phone privileges were revoked; (3) admitting the testimony of Officer Brian Arant ("Officer Arant") about Victim's identification of Stanley as the shooter; (4) allowing the State to question Victim about prior alleged acts of domestic violence against her by Stanley;

---

[1]Pursuant to section 595.226.1 RSMo 2016, we have used the term "Victim" to protect the identity of the victim.

(5) overruling Stanley's objection and allowing Tonya Stanley ("Tonya")[2] to testify; and (6) seating juror venirepersons 24, 44, and 41. We affirm.

**Factual and Procedural History[3]**

Stanley does not challenge the sufficiency of the evidence to support his convictions. In September 2016, Victim, Stanley's ex-girlfriend, was in a romantic relationship with Torrance Evans ("Evans"). On the evening of September 24, 2016, Evans celebrated his birthday with Victim and his friends including Leonard Edwards ("Edwards") and Gary Jones ("Jones"). After celebrating, they all spent the night at the home of Jones. The next morning, Victim had a phone conversation with Tonya, Stanley's mother, in which Tonya expressed concern that Stanley might be suicidal. Thereafter, Victim left Jones's home and called Stanley. Victim arranged to meet Stanley at a gas station. At the gas station, Stanley got in Victim's vehicle where he questioned her about her whereabouts, exhibited a gun, and threatened to hit and shoot Victim. Stanley took Victim's phone and questioned her about her relationship with Evans. After Victim admitted to a sexual relationship with Evans, Stanley hit her in the face. When Victim tried to exit her vehicle, Stanley put her in a chokehold and threatened to shoot her if she tried to escape. Stanley took Victim's keys, got out of Victim's vehicle and went to move his vehicle. Once Stanley was gone, Victim got out of her vehicle and ran to a nearby McDonald's. Before Victim could get to the McDonald's, Stanley had gotten back in her vehicle, approached her and

---

[2]Because Tonya Stanley shares a surname with Darian Stanley, we refer to her by her first name for purposes of clarity. No familiarity or disrespect is intended.

[3]"On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." *State v. Rice*, 504 S.W.3d 198, 200 n.3 (Mo. App. W.D. 2016).

threatened that if she did not get back in her vehicle with him, he would shoot her. Stanley found Jones's address in Victim's phone but did not know how to get there. While driving around, Stanley told Victim that she was going to watch Stanley kill Evans and then he would kill her. Victim started crying and Stanley hit her in the face again. Stanley instructed Victim to call Evans and drive them to Jones's home. When they got to Jones's house, Evans came out, and Victim escaped from her vehicle. Stanley shot Evans from Victim's vehicle and then drove off without Victim.

Edwards and Jones heard gunshots from inside Jones's home and ran outside. Edwards and Jones found Evans had been shot and was lying in the street. Evans said, "He shot me, he shot me." Edwards and Jones saw Victim who was crying. Jones asked Victim who shot Evans and she said Stanley. Victim also said that Stanley was going to kill her children.

Evans was shot seven times, causing his death. Police located Victim's vehicle in the driveway of a vacant house near the gas station where she had met Stanley. GPS mapping of Stanley's cell phone records showed it was connecting to cell towers in the vicinity of the crime scene and gas station at times relevant to his meeting with Victim and the shooting of Evans. Stanley's cell phone records also tracked Stanley's travel from Kansas City to Tulsa, Oklahoma after the shooting. On September 27, 2016, Stanley was arrested in Tulsa, Oklahoma. Stanley was charged as a prior offender with murder in the first degree, armed criminal action and kidnapping in the first degree.

3

On December 19, 2016 while Stanley was being held in the Jackson County Detention Center, the State filed a motion requesting an order to prohibit Stanley from having any contact with Victim. The State alleged Victim had been visiting Stanley at the detention center. On January 9, 2017, the trial court granted the State's motion and prohibited any jail visits or phone calls between Stanley and Victim. On March 9, 2017, the State filed a motion to deny Stanley's phone privileges altogether, alleging he attempted to call Victim 292 times since the trial court's January 9, 2017 order. On March 22, 2017, the trial court entered an order completely revoking Stanley's phone privileges while incarcerated during the pendency of this case.

On December 9, 2017, Stanley's attorney filed a motion to withdraw as requested by Stanley. After a hearing, during which Stanley testified and executed a waiver of counsel form, the trial court entered its order granting the motion to withdraw finding Stanley's waiver of the right to counsel timely, unequivocal, knowing, and intelligent.

On January 10, 2018, a jury trial commenced after which Stanley was found guilty of murder in the first degree and armed criminal action and sentenced to consecutive sentences of life imprisonment without parole and life imprisonment. Stanley was acquitted on the charge of kidnapping. Stanley filed an amended motion for leave to file a motion for new trial out of time which was denied by the trial court.

Stanley appeals. Additional facts will be developed as they become relevant to Stanley's points.

**Standard of Review**

Stanley requests plain error review because he failed to properly preserve his claims for review by filing a timely motion for new trial.[4]  To preserve a claim for appellate review, an appellant must include the specific allegation of error in the motion for new trial.  *State v. Nickels*, 598 S.W.3d 626, 633 (Mo. App. E.D. 2020).  Nevertheless, we have discretion to review claims that are not preserved by inclusion in a motion for new trial.  *Id.*

"When analyzing an issue for plain error, this Court must find 'manifest injustice or a miscarriage of justice resulting from the trial court's error.'"  *State v. Ellis*, 538 S.W.3d 335, 337 (Mo. App. W.D. 2017) (quoting *State v. Celis-Garcia*, 344 S.W.3d 150, 154 (Mo. banc 2011)).  "The review for plain error is a two-part test.  First, this Court must determine whether 'an evident, obvious, and clear error' has occurred that 'facially establishes substantial grounds for believing that manifest injustice or a miscarriage of justice' has occurred."  *Id.* (quoting *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009).  "Second, "[i]f an error is found, the court must determine whether the error actually resulted in a miscarriage of justice or manifest injustice."  *Id.*

**Analysis**

Stanley raises eight claims on appeal.  Stanley claims the trial court plainly erred in: (1) compelling Victim to testify over her assertion of marital privilege; (2) allowing Stanley to represent himself while his phone privileges were revoked; (3)

---

[4]Additionally, Points II, III, IV, VI, VII, and VIII were not preserved due to a lack of objection at trial.

5

admitting the testimony of Officer Arant about Victim's identification of Stanley as the shooter; (4) allowing the State to question Victim about prior alleged acts of domestic violence against her by Stanley; (5) overruling Stanley's objection and allowing Tonya to testify; and (6-8) seating juror venirepersons 24, 44, and 41.

### *Point I – Assertion of Spousal Privilege*

In Point I, Stanley argues that the trial court plainly erred in compelling Victim to testify over her assertion of the spousal privilege because this ruling violated sections 451.040[5] and 546.260 in that Victim and Stanley entered into a valid marriage ten months before trial. We disagree.

At trial, the State called Victim to testify and she invoked the spousal privilege. Out of the presence of the jury, the trial court held a hearing regarding the validity of the marriage between Victim and Stanley. Victim testified that she married Stanley on March 8, 2017. Victim stated that she arranged to meet Natalie Remington ("Remington") at the Jackson County Detention Center on March 8, 2017, for the purpose of marrying Stanley. Remington is an ordained wedding minister, performing weddings under the business name, Your Magical Day. Upon meeting Remington, Victim gave Remington the marriage license and certificate. Remington signed the documents and gave them back to Victim. Soon thereafter, a prosecutor came to the detention center and informed them that there was not going to be a marriage that day. Victim and Remington were not allowed to see Stanley due to the trial court's no contact order. Nonetheless, Victim testified that Remington told her

---

[5]All statutory references are to RSMo 2016 as currently updated, unless otherwise noted.

that she and Stanley were married and Victim filed the marriage license with Jackson County. Victim testified that the marriage license was not signed by any witnesses. She talked to Stanley on the phone later that day and told him they were married even though they were not allowed to see him, to which he was surprised.

Remington never spoke to Stanley, had not seen him until the day of trial, nor was she able to recall his name at trial. She never confirmed with Stanley that he wanted to be married to Victim. She acknowledged that there was no marriage ceremony. Remington explained that she signs the marriage license and certificate before prison weddings because the prisons do not allow her to bring in a pen. Remington did not attempt to retrieve the marriage license and certificate from Victim because she believed that was the prosecutor's responsibility because she "was out of the equation." The following question and answer took place:

> Q (by Prosecutor): So you thought it was the prosecutor's responsibility to take back paperwork that you signed *before you solemnized* a marriage?
>
> A (by Remington): Yes, I did.

Remington further stated that she told Victim that she was married because Remington signed the marriage license. Remington testified that now she understands that Missouri does not permit marriages where one of the people to be married is not present.

The trial court found that the marriage was not valid because it was not solemnized. The trial court found that "[t]o solemnize . . .is to perform a formal ceremony such as a marriage ceremony before witnesses as distinguished from a

7

clandestine ceremony. It's defined as a formal act before witnesses." The trial court found that the section 193.185 requires witnesses. After hearing the audio recording of the call in which Victim tells Stanley that he is married, the trial court concluded that "his response to the situation did not appear to be someone that recognized they were married." The trial court also noted that the marriage license says "Return of person solemnizing marriage. It appears that [Remington] shouldn't have signed this document until afforded the opportunity to solemnize the marriage. She did not solemnize the marriage." The trial court read section 451.040.1, which stated, "no marriage contracted shall be recognized as valid unless the license has been previously obtained and unless the marriage is solemnized by a person authorized by law to solemnize marriages." The trial court ordered Victim to testify because there was no valid marriage; that the spousal privilege does not apply. We agree with the trial court's findings.

Section 546.260 which provides for the spousal privilege states, in pertinent part, "no person on trial or examination, nor wife or husband of such person, shall be required to testify[.]" Implicit in this right to invoke the spousal privilege is existence of a valid marriage. *See State v. Nolan*, 316 S.W.2d 630, 635-36 (Mo. 1958) (no privilege if two people are not legally married because a license was not obtained); *State v. Byrd*, 676 S.W.2d 494, 500-01 (Mo. banc 1984) (no privilege where one party to the purported marriage is married to a third party); *State v. Hankins*, 642 S.W.2d 606, 611-12 (Mo. banc 1982) (no privilege where purported common law marriage does not qualify as a legal marriage). "'The party claiming a privilege must show it

8

is applicable.'" *State v. Davies*, 330 S.W.3d 775, 795 (Mo. App. W.D. 2010) (citation omitted). Therefore, the burden is on Stanley to demonstrate a valid marriage exists to provide a basis for Victim to assert the spousal privilege not to testify against Stanley.

In determining whether a valid marriage exists, this court looks to see if Stanley and Victim complied with the statutorily proscribed requirements. *Nelson v. Marshall*, 869 S.W.2d 132, 134 (Mo. App. W.D. 1993). As a part of Missouri's laws regulating marriage, section 451.040.1 requires a license be obtained and the marriage be solemnized. Section 451.040.1 provides:

> Previous to any marriage in this state, a license for that purpose shall be obtained from the officer authorized to issue the same, and no marriage contracted shall be recognized as valid unless the license has been previously obtained, and unless the marriage is solemnized by a person authorized by law to solemnize marriages.

Additionally, section 193.185.3 governing the marriage certification requires, "Each person who performs a marriage shall certify the fact of marriage and return the license to the official who issued the license within fifteen days after the ceremony. This license shall be signed by the witnesses to the ceremony." And, section 451.080.3 requires that the person solemnizing the marriage shall certify the marriage on the license and return it to the recorder within fifteen days after issuance.

> The general rule when interpreting a statute is to ascertain the legislative intent from the statute's language, to give effect to that intent if possible, consider the words in their plain and ordinary meaning, and when the language is unambiguous, we are afforded no room for construction. In determining whether the language is clear and unambiguous, the standard is whether the statute's terms are plain and clear to one of ordinary intelligence.

9

*Nelson*, 869 S.W.2d at 134 (internal quotation marks and citations omitted).

It is undisputed that a license was obtained by Victim.[6] Thus, the only issue regarding compliance with section 451.040.1 is whether the marriage was solemnized; it was not. The language "no marriage hereafter contracted shall be recognized as valid . . . unless the marriage is solemnized by a person authorized by law to solemnize marriages" is unambiguous on its face. The plain language of the statute requires solemnization for a valid marriage contract. However, section 451.040 does not define the term solemnization. In *Chervitz v. Bi-State Development Agency*, 11 S.W.3d 714, 717 (Mo. App. E.D. 1999), the Court stated, "'to solemnize means nothing more than to be present at a marriage contract, in order that it may have due publication, before a third person or persons, for the sake of notoriety and the certainty of its being made.'" (quoting *Dyer v. Brannock*, 66 Mo. 391 (1877)). Solemnization is defined as "the performance of a formal ceremony (such as a marriage ceremony) before witnesses, as distinguished from a clandestine ceremony." Black's Law Dictionary (11th ed. 2019). These definitions are both consistent with the requirement of witnesses set forth in section 193.185.3.

Here, it is undisputed that there was no ceremony of any kind and that Victim and Stanley never appeared together before a third person. It is also undisputed that the license was not signed by any witnesses as required by section 193.185.3 and that it was not returned to the recorder by Remington as required by section 451.080.

---

[6]Section 451.040.2(1) requires an incarcerated marriage license applicant submit an affidavit to the recorder of deeds. State's exhibit D reflects such an affidavit was executed by Stanley and submitted to the recorder of deeds.

10

In his brief, Stanley argues that the prosecutor in a criminal case has no standing to challenge the validity of his purported marriage to Victim. However, at oral argument, Stanley conceded that the State has standing to challenge Victim's assertion of the spousal privilege. As such, Stanley's standing argument is deemed abandoned.

Stanley cites *Meister v. Moore*, 96 U.S. 76 (1877), where it was held that the form of the ceremony--or even if all ceremony was dispensed with--took second seat to the intent of the parties to be married. That case is not helpful here as it involved the approval of a common law marriage in Michigan. Missouri does not recognize common law marriages and implemented solemnization and license requirements to eliminate common law marriages. *Nelson*, 869 S.W.2d at 134.

Stanley cites *Chervitz* but it is not helpful to his case in that, there, it was undisputed that the couple appeared before a minister and a ceremony was performed. 11 S.W.3d at 716. The issue in *Chervitz* was that the minister who performed the ceremony failed to sign the marriage license. *Id.* Stanley notes that the Court in *Chervitz* cited *Dyer,* 66 Mo. at 410, for the statement that "to solemnize means nothing more than to be present at a marriage contract, in order that it may have due publication, before a third person or persons, for the sake of notoriety and the certainty of its being made." 11 S.W.3d at 717. This definition does not help Stanley's case either as he was not present with Victim before a third person.

Finally, Stanley cites the Virginia case *Levick v. MacDougall*, 805 S.E.2d 775 (Va. 2017) for the statement that Virginia law does not require the parties to

11

marriage be in the presence of each other or in the presence of the officiant. The law of Virginia is not instructive or compelling here.

Because it is undisputed that the parties did not comply with the statutory requirements for a valid marriage, we cannot find "'an evident, obvious, and clear error' has occurred that 'facially establishes substantial grounds for believing that manifest injustice or a miscarriage of justice' has occurred." *Ellis*, 538 S.W.3d at 337 (citation omitted). Therefore, the trial court did not plainly err in determining that there was no valid marriage between Stanley and Victim and, thus, the spousal privilege did not apply.

Point I is denied.

### *Point II – Ability to Investigate the Case*

In Point II, Stanley argues that the trial court plainly erred in allowing him to represent himself because his waiver could not be voluntary, unequivocal, knowing and intelligent because the trial court failed to give Stanley the ability to investigate his case since his phone privileges from the jail were totally denied.[7]

> The Sixth Amendment right to counsel implicitly embodies a correlative right to dispense with a lawyer's help. This right applies to the states through the Due Process Clause of the Fourteenth Amendment. The circuit court has no discretion to force an attorney upon a defendant who validly waives the right to counsel. Nevertheless, for a waiver of counsel to be effective, due process requires that the waiver be made knowingly and intelligently.

---

[7]Regarding standard of review, we note that a "self-represented defendant's failure to object at trial regarding the knowing, voluntary, and intelligent nature of his waiver of the right to counsel is generally excused," however, the defendant is bound to raise the claim in a motion for new trial. *State v. Kunonga*, 490 S.W.3d 746, 759-60 (Mo. App. W.D. 2016). Here, Stanley did not raise this claim at trial or in a motion for new trial and, therefore, it is not preserved for review. *Id.* Thus, like the other points raised on appeal, it is subject to plain error review only. *Id.*

12

Missouri has two requirements that must be satisfied before the circuit court can conclude that a defendant has effectively waived the right to counsel. First, there must be a thorough *Faretta*[8] evidentiary hearing that establishes that the defendant understands exactly what rights and privileges he is waiving, as well as the dangers associated with waiving constitutional rights. Second, the defendant must be given the opportunity to sign the written waiver of counsel form mandated by Section 600.051.

Looking first at the adequacy of the waiver of counsel hearing, we note that there is no specific litany required for a *Faretta* hearing. Instead, whether a *Faretta* hearing establishes that a waiver of counsel is knowingly and intelligently made depends on the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. The defendant's knowledge of all relevant facts need not appear in the trial record to support a finding that the waiver of counsel was proper.

 . . . .

Section. 600.051.1 outlines the required contents of [the written waiver of counsel,] which is to be signed before and witnessed by the judge or clerk of the court and read by or to the defendant before signing . . . . The written waiver required by this section provides objective assurance that the defendant's waiver is knowing and voluntary.

*State v. Ndon*, 583 S.W.3d 145, 154-56 (Mo. App. W.D. 2019) (internal citations

and quotation marks omitted).

Here, the trial court conducted a *Faretta* hearing, and Stanley executed a

written waiver of counsel form pursuant to section 600.051. On December 9, 2017,

defense counsel filed a motion to withdraw upon Stanley's request to proceed *pro se*.

On December 13, 2017, the trial court held a *Faretta* hearing and heard evidence on

defense counsel's motion to withdraw. The trial court heard testimony from Stanley

and the trial court prepared the section 600.051 written waiver of counsel. The trial

---

[8]*Faretta v. California,* 422 U.S. 806 (1975).

court questioned Stanley extensively regarding his right to legal representation, his appointed counsel, his education, the reasons why he wanted to represent himself, the possibility of stand-by counsel, the responsibilities and risks of representing himself at trial, his legal knowledge, the range of punishment he was facing, the court rules, and whether he has any mental or physical impairments. Although the trial court advised Stanley that it would consider it a mistake for him to proceed *pro se*, Stanley said he understood but still wanted to represent himself.

The written waiver complied with the requirements set forth in section 600.051, including that it was read to and signed by Stanley and witnessed by the trial court. The trial court found that Stanley's waiver of the right to counsel is "timely, unequivocal, knowing, and intelligent" and granted his request to represent himself. Over defense counsel's and Stanley's objections, the trial court ordered defense counsel to remain in the case as stand-by counsel and to be present at the trial of the case. The trial court continued the case to January 8, 2018. The trial court granted Stanley an additional eight hours per week in the law library at the Jackson County Detention Center.

At a pretrial conference on December 18, 2017, the trial court inquired if Stanley still wished to represent himself to which Stanley responded affirmatively. The trial court granted stand-by counsel's motion to withdraw. At this hearing, *after* Stanley advised he still wished to represent himself, Stanley made an oral motion requesting that the trial court rescind its March 22, 2017 order revoking his phone privileges because it was hindering his trial preparation. During this hearing,

Stanley volunteered that even though his phone privileges had been ordered revoked, he had still managed to gain telephone access and had contacted Victim in violation of the trial court's no-contact and no-telephone-access orders, thus defying two, separate orders of the trial court. The trial court advised Stanley that it would not rescind an order which he admitted violating and denied Stanley's motion. After denying said motion, the trial court stated it would call Stanley back to the stand and "have a little bit more of the *Faretta* hearing because this could have a material impact on [Stanley's] decision" to represent himself. Stanley testified that the trial court's decision not to rescind its order regarding his phone privileges did not change his decision to represent himself. In its order the trial court stated:

> After issuing its ruling, the Court again questioned the Defendant under oath regarding his decision to proceed Pro Se. The Defendant remained steadfast that he intended to proceed Pro Se. Based on the Defendant's continued invocation of his constitutional right to represent himself, the Court permits the Defendant to proceed Pro Se.

Stanley does not allege any deficiencies with either the *Faretta* hearing or the written waiver. Stanley's sole argument is that because the trial court would not reinstate his phone privileges, he could not investigate his case for trial, and therefore, the trial court should not have allowed counsel to withdraw.

Stanley relies solely on *People v. Finkelstein*, 68 N.E.3d 64, 67 (N.Y. App. 2016), where the New York court of appeals held that the trial court did not infringe on defendant's constitutional right to represent himself by ruling that he forfeited his right of self-representation during pretrial proceedings where defendant had abused his privileges of phone and library access in such a way that jeopardized his ability

15

to prepare for trial. Stanley fails to demonstrate *Finkelstein's* application to the facts of this case. We find *Finkelstein* neither controlling nor instructive in that the facts of *Finkelstein* are clearly distinguishable. Finkelstein was *already* proceeding pro se, after which time the court determined he had abused his phone and library privileges, thereby jeopardizing his ability to prepare. *Id.* Here, Stanley had already lost his phone privileges when he exercised his right to represent himself. He was questioned at length, *twice*, by the learned trial judge, as well as signing the written waiver of counsel. Both times, Stanley ultimately chose to represent himself despite the concerns expressed by the court.

We find that the trial court's *Faretta* hearing elicited ample evidence that Stanley's waiver of his right to counsel was voluntary, unequivocal, knowing, and intelligent *even after* his December 18, 2017 motion to reinstate his phone privileges was denied. Stanley also signed the written waiver of counsel which "provides objective assurance that the defendant's waiver is knowing and voluntary." *Ndon*, 583 S.W.3d at 156. Therefore, we do not find evident, obvious, and clear error by the trial court in allowing Stanley to represent himself.

Point II is denied.

### *Point III* – Admissibility of Officer Arant's Testimony

In Point III, Stanley argues that the trial court plainly erred in admitting testimony of Officer Arant about Victim's identification of Stanley as the shooter to Officer Kaylee Lull ("Officer Lull") in violation of Stanley's right to confrontation

16

because Victim's statements were testimonial and did not fall under the excited utterance exception.

At trial, Officer Arant testified that on September 25, 2016, he was a field training officer supervising Officer Lull. Officer Arant stated he and Officer Lull were riding in the same squad car when they responded to the scene of the shooting. Officer Arant stated he was with Officer Lull when she interviewed Victim who was visibly upset, shaking, and crying. Officer Arant testified that he heard Victim tell Officer Lull that she had picked up Stanley in her vehicle; that Stanley had her drive back to this location; that Stanley had her call Evans to come out of the house; and that Stanley shot Evans.

Stanley argues that Victim's identification of him as the shooter to Officer Lull was testimonial hearsay that did not qualify under the excited utterance exception. In his argument, Stanley sets out the testimony of Jones and Edwards where they testified that Victim identified Stanley as the shooter at the scene. Stanley argues that even if Victim's identification of Stanley as the shooter to Jones and Edwards qualified as excited utterances, her identification of Stanley as the shooter to Officer Lull did not because she had the opportunity to calm down by the time she spoke to Officer Lull.

Even if we found that it was error to admit Officer Arant's testimony, which we do not, we cannot find that the admission of this testimony resulted in a miscarriage of justice or a manifest injustice because this evidence was cumulative. "'An allegedly wrongful admission of hearsay testimony does not constitute plain

error if such testimony is merely cumulative to other evidence properly admitted.'" *State v. Lucio*, 247 S.W.3d 131, 135 (Mo. App. S.D. 2008) (quoting *State v. Goodwin*, 43 S.W.3d 805, 818 (Mo. banc 2001)). Here, State's exhibit 3, the dash cam video recording of Officer Lull's interview of Victim in which Victim states that Stanley was the shooter, had *already* been admitted into evidence and played for the jury. Moreover, Victim identified Stanley as the shooter in State's exhibit 71, her video recorded statement to police which was also admitted into evidence and played for the jury. Furthermore, as Stanley sets out in his argument, Jones and Edwards each testified at trial that Victim identified Stanley as the shooter at the scene.

Stanley also argues that the admission of Officer Arant's testimony violates the Confrontation Clause without any further explanation. Stanley cites *Crawford v. Washington*, 541 U.S. 36 (2004), for the statement, "Admission of testimonial hearsay where there is no opportunity to cross-examine the declarant violates the Confrontation Clause." Here, Stanley's argument fails on its face because Victim testified at trial and was subject to cross-examination by Stanley.

The trial court did not plainly err in admitting the testimony of Officer Arant. Point III is denied.

### *Points IV* – **Prior Acts of Domestic Violence**

In Point IV, Stanley argues that the trial court plainly erred in allowing the State to question Victim regarding prior alleged acts of domestic violence against her by Stanley because this line of questioning violated Stanley's rights to due process and to be tried only for the crime with which he was charged in that any probative

value that this improper propensity evidence may have had to shed light on any material issue was clearly outweighed by its prejudicial impact. We disagree.

"'[A] defendant has the right to be tried only for the offense for which he is on trial, and . . . evidence of other crimes committed by [the] defendant is normally inadmissible.'" *State v. Berwald*, 186 S.W.3d 349, 358 (Mo. App. W.D. 2005) (citation omitted). "While evidence of a criminal defendant's prior bad acts is generally inadmissible, a defendant is not in a position to complain of the State inquiring about matters brought into the case by his own question." *State v. Fassero*, 256 S.W.3d 109, 118 (Mo. banc 2008). "In other words, a defendant may not provoke a reply to his own argument and then claim error." *Id.*

Here, Stanley does not allege that the State inquired of prior bad acts on direct examination and complains only of the State's questioning on re-direct examination. Stanley, however, opened the door to this evidence by asking Victim on cross-examination about any prior domestic violence in their relationship. Stanley asked Victim, "Was there any physical or domestic abuse in the home while you and [Stanley] was [sic] together?" Victim answered, "No." Victim also denied that she had told law enforcement that there was abuse in the home. On redirect, the State asked Victim about physical abuse by Stanley in their relationship. In response, Victim stated that she did not remember describing domestic abuse to law enforcement. At no time during its direct examination of Victim did the State seek to elicit testimony of Stanley's violence against Victim. It was only *after* Stanley opened the door on cross-examination for such evidence to be elicited and *after*

19

Victim's denial of domestic violence on redirect examination, that the State played Victim's recorded interview in which she described the prior acts of violence committed by Stanley against her. Therefore, we cannot find evident, obvious and clear error as Stanley opened the door to this line of questioning.

Point IV is denied.

### *Point V* – **Stanley's Mother is a Proper Witness**

In Point V, Stanley claims that the trial court plainly erred in overruling his objection and allowing Tonya to testify because the State served her with a subpoena in the middle of trial, surprising Stanley in violation of his right to due process, fair trial and to present a defense because the late disclosure prevented Stanley from having sufficient time to prepare to meet the State's case. We disagree.

It is undisputed that Tonya was endorsed as a witness prior to trial. However, the State was unable to serve her a subpoena to testify until she brought Stanley lunch during the trial. Nonetheless, the trial court gave Stanley the opportunity to interview Tonya before she testified, which he rejected.

Rule 25.03(b)(2) provides that the State must disclose to defendants the witnesses it intends to call at trial, together with their written or recorded statements.

Stanley concedes in his argument that this was not a discovery violation and that Tonya had been endorsed as a witness by the State. Stanley cites authority regarding discovery violations which is inapplicable in light of his concession that no discovery violation took place here. If Stanley believed that Tonya's testimony still

20

amounted to a surprise for which he was unable to prepare, he would have accepted the trial court's invitation to interview her before she took the stand, a remedy Stanley rejected. *State v. Boss*, 577 S.W.3d 509, 516 n.11 (Mo. App. W.D. 2019).

Further, a subpoena is not required for a witness to provide competent testimony, it merely compels the attendance of the properly-served witness at trial. Stanley's claim of surprise is without merit as Tonya was disclosed as a witness during discovery. The fact that Tonya was not served until mid-trial does nothing to affect her competency as a witness because of the State's proper disclosure during the discovery phase of the case.

Thus, we cannot find evident, obvious, and clear error by the trial court in allowing a properly endorsed witness to testify.

Point V is denied.

### *Points VI, VII, and VIII* – Court's Failure to
### Strike Venirepersons *sua sponte*

In Points VI, VII, and VIII, Stanley claims that the trial court plainly erred in seating juror venirepersons 24, 44, and 41. Stanley did not request that any of these venirepersons be struck. Stanley claims the trial court plainly erred in failing to *sua sponte* prevent these three members of the venire panel from serving as jurors. We disagree.

Stanley's failure to challenge these venirepersons for cause "results in a waiver of review." *State v. Skinner*, 494 S.W.3d 591, 594 (Mo. App. W.D. 2016). "The requirement of contemporaneous objections to the qualification of jurors is a well-

founded rule that minimizes 'the incentive to sandbag in the hope of acquittal and, if unsuccessful, mount a post-conviction attack on the jury selection process.' Post-conviction challenges to jury selection, therefore, are 'highly suspect.'" *Id.* (citations omitted).

Stanley's request for plain error review fails because:

Missouri courts have consistently held that a trial court is under no duty to remove any venire member *sua sponte*. Where the trial court is under no duty to strike a venire member on its own motion, there is no evident, obvious, or clear error, and therefore no plain error. Because there is no plain error, this Court need not proceed to the second step of determining whether the claimed error resulted in manifest injustice or a miscarriage of justice.

*Id.* (citations and internal quotation marks omitted).

Nonetheless, we find that even if the trial court did have a duty, each of Stanley's claims with regard to these venirepersons fail. Stanley argues that venireperson 24 should have been struck because she stated that she could not be fair and impartial due to the murder of her sister. Upon review of the record, it appears that an error in the transcript was made where, in fact, it was venireperson *42, not 24,* that stated she could not be fair and impartial due to the murder of her sister. Venireperson 42 was struck for that reason. The record reflects that in response to the State's question regarding whether anyone had been a victim of a violent crime, venireperson 24 responded that she was at the Boston Marathon bombing. The State then noted that it saw three other hands and called on venireperson 42, who answered that her sister was murdered. The excerpt from the transcripts reflects the line of questioning and the typographical error:

22

Venireperson No. 24:  I was at the Boston Marathon bombing.

State: And is there anything about that experience that you believe would prevent you from being fair and impartial in this case?

Venireperson No. 24: No.

State:  I saw three other hands.  Juror No. 42, yes, ma'am?

Venireperson No. 24 [sic]: My sister was murdered.

The conversation continues about the murder and concludes with that venireperson stating that she thinks it would prevent her from being fair and impartial in this case.  Later, at the conference on strikes, the State moved to strike Venireperson 42 for cause because "[t]his individual was the one that had a sister that was murdered . . . and said she could not be fair and impartial."

Stanley claims that venireperson 44 should have been struck because he was unable to say unequivocally that he could be fair and impartial.  We disagree.  The record reflects that venireperson 44 responded affirmatively to the State's inquiry to the panel as to whether they had previously heard of this case.  In response to further questioning, venireperson 44 stated that he had read an article that may have been about this case.  The State, the Court, and Stanley questioned venireperson 44.  Ultimately, in response to whether he could set aside what he had read and be guided by the evidence that he heard during the trial, venireperson 44 stated, "I believe I could do it" and "I would do my best."

Similarly, Stanley claims venireperson 41 should have been struck because she was unable to say unequivocally that she could be fair and impartial.  Venireperson 41 responded that her sister had been murdered and she had been a victim of

23

domestic violence. When asked if she could set aside those experiences and be fair and impartial, she stated, "I believe so."

Venirepersons 44 and 41 did not state that they could not be fair and impartial. In fact, both jurors stated that they believed they could be fair and impartial. Stanley cites *State v. Hopkins*, 687 S.W.2d 188 (Mo. banc 1985) which is factually distinguishable. First, the alleged error in *Hopkins* was the trial court's failure to grant the defendant's *challenge for cause* to a venireperson who struggled with uncertainty as to his ability to be impartial. Here, Stanley made no such challenge and instead relies on plain error review. Second, in finding reversible error in *Hopkins*, the Supreme Court noted that not once did the venireperson unequivocally state he could try the case impartially, only that he would try to be impartial. *Id.* at 191. Here, both venirepersons stated that they believed they could be impartial, not that they merely hoped to or would try to be impartial.

Because the trial court is under no duty to strike a venire member on its own motion, we find no evident, obvious, or clear error in the trial court for seating venirepersons 24, 44, and 41. *Skinner*, 494 S.W.3d at 594.

Points VI, VII, and VIII are denied.

### Conclusion

We affirm the trial court's judgment.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.

24